553 S.E.2d 110

Leo ZABINSKI and John Brainard, Appellants,

v.

BRIGHT ACRES ASSOCIATES, a South Carolina General Partnership, Henry Massey, and the Estate of John Leutwiler, deceased, individually, and as General Partners.

and

Estate of John Leutwiler, Respondents, Third–Party Plaintiff,

v.

John Martin Brainard, Michael Forsyth Brainard, Joanne Foye Brainard, Melanie Brainard, David McLeod Brainard, Allison Christie Brainard, LOM Development, LLC, Wachovia Mortgage Co., HRM, Inc., and Edward Bullard, Third–Party Defendants.

and

Bright Acres Associates, a South Carolina Partnership Fourth–Party Plaintiff,

v.

J. Ray Westmoreland, Fourth–Party Defendant.

No. 25358.

Supreme Court of South Carolina.

Heard June 19, 2001.

Decided Sept. 4, 2001.

Rehearing Denied Oct. 10, 2001.

A. Parker Barnes, Jr., of Beaufort, for appellants Leo Zabinski and John Brainard.

Terry A. Finger, of Finger, Taylor & Andrews, of Hilton Head, for respondents Henry Massey and Bright Acres Associates.

J. Ray Westmoreland, of Hilton Head, for respondent Estate of John Leutwiler.

Susan Taylor Wall, and Mary Legare Hughes, both of Nexsen, Pruet, Jacobs, Pollard & Robinson, LLC, of Charleston, for third-party defendant Bullard.

TOAL, Chief Justice:

In this partnership dispute, three partners appeal from an Order denying arbitration.

### FACTUAL/PROCEDURAL BACKGROUND

Bright Acres Associates ("Bright Acres") was a partnership consisting of the following four equal partners: John Leutwil-

er ("Leutwiler"), Henry Massey ("Massey"), John Brainard ("Brainard"), and Leo Zabinski ("Zabinski"). The partnership was created in 1980 in order to buy, renovate, and sell thirty apartments and approximately twenty-six acres of land on Hilton Head Island. J. Ray Westmoreland ("Westmoreland"), attorney for Leutwiler's estate ("Respondent"), prepared the partnership agreement, which expressly provided for arbitration of all controversies or claims arising out of the partnership agreement. However, the face of the partnership agreement was not stamped to that effect as required by the South Carolina Arbitration Act, S.C.Code Ann. § 15–48–10(a) (Supp. 2000).

On October 20, 1998, after Leutwiler's death, Massey expressly agreed to purchase Leutwiler's 25% interest in the partnership. Westmoreland prepared the purchase agreement. Massey failed to make all payments required by the written purchase agreement. Massey and Respondent disagreed as to what percentage, if any, Massey acquired in Leutwiler's original 25% of the partnership. Because of this dispute, Massey and Westmoreland disagreed as to the amount of distributions that were to be made to each partner once the partnership dissolved.

On September 8, 1998, Zabinski and Brainard ("Appellants") commenced a pro se action seeking arbitration of the distribution and other partnership disputes. After Respondent moved to make Appellants' original Complaint more definite and certain, Appellants retained Attorney James M. Herring ("Herring") who amended the original Complaint on March 19, 1999. Herring moved to compel arbitration.

On April 21, 1999, Respondent answered the Amended Complaint, opposing arbitration on the ground the partnership agreement Westmoreland prepared failed to prominently display on its face that it was subject to arbitration. Furthermore, Respondent alleged: (1) the controversies were not subject to arbitration; (2) Massey and his attorney were using their position to deprive Respondent of his partnership interest: (3) the remaining partners failed to provide partnership information; (4) Leutwiler was prevented from exercising any management duties in the partnership; (5) remaining partners failed to account for various funds and assets of the partner-

ship; and (6) remaining partners threatened to withhold partnership benefits unless Leutwiler agreed to a settlement with Massey in regards to the case then on appeal with this Court. Respondent also sought damages against Appellants, Massey, and Massey's attorney.

On June 22, 1999, Respondent moved to have a receiver appointed. On August 12, 1999, Respondent filed and served a Motion to Compel the Return of Funds and Deposit. No sworn testimony was filed in support of these motions.

On August 13, 1999, Judge Kemmerlin held a status conference on the case. Appellants asked the trial court not to rule on any motion other than the motion for arbitration without a hearing. On August 25, 1999, Judge Kemmerlin denied arbitration and issued a temporary restraining order ("TRO"), restraining the partnership from disbursing any more funds and suggesting that the trial court may appoint a receiver in the future.

On September 3, 1999, Appellants moved to alter or amend the trial court's order, and the trial court refused. On March 13, 2000, Judge Kemmerlin recused himself. On March 14, 2000, Appellants served a Notice of Appeal. The following issues are before this Court on appeal:

I. Is Respondent equitably estopped from asserting Appellants are not entitled to arbitration, where Respondent's attorney prepared the partnership agreement and is now asserting the agreement fails to comply with the South Carolina Arbitration Act, S.C.Code Ann. § 15–48–10(a) (Supp.2000)?

II. Did the trial court err in failing to order arbitration because the partnership was engaged in interstate commerce sufficient to invoke the Federal Arbitration Act ("FAA")?

III. Did the trial court err in issuing the TRO without providing proper notice to Appellants?

IV. Did the trial court err in issuing the TRO without any sworn testimony in support thereof?

V. Were Appellants prejudiced because they had no opportunity to demonstrate the allegations contained in

the unsworn Motion for the Return of Funds and Deposit were false?

## LAW/ANALYSIS

### I. Equitable Estoppel

■ Appellants argue Respondent is equitably estopped from opposing arbitration because Respondent's attorney, Westmoreland, prepared the partnership agreement with the defective arbitration clause. We disagree.

On December 22, 1980, Westmoreland prepared the partnership agreement for Bright Acres. The partnership agreement provided for arbitration of all claims and controversies arising from the agreement. Paragraph fourteen of the partnership agreement states:

If any controversy or claim arising out of this partnership agreement cannot be settled by the partners, the controversy shall be settled by arbitration in accordance with the rules of the American Arbitration Association then in effect, and judgment on the award may be entered in any court having jurisdiction.

Westmoreland failed to stamp the first page of the partnership agreement with the language required by the South Carolina Arbitration Act, S.C.Code Ann. § 15–48–10(a) (Supp.2000). Section 15–48–10(a) provides:

A written agreement to submit any existing controversy to arbitration or a provision in a written contract to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract. *Notice that a contract is subject to arbitration pursuant to this chapter shall be typed in underlined capital letters, or rubber-stamped prominently, on the first page of the contract and unless such notice is displayed thereon the contract shall not be subject to arbitration.*

(emphasis added).

■ We have strictly construed the notice requirement of section 15–48–10(a). In *Soil Remediation Co. v. Nu–Way Envtl., Inc.*, 323 S.C. 454, 476 S.E.2d 149 (1996), we held the terms of section 15–48–10(a) are clear, and those terms must

be applied according to their literal meaning. *Id.* at 457, 476 S.E.2d at 151. The notice provision in the *Soil Remediation* contract did not meet the statutory requirement because it was laser-printed and written in all capital letters on the first page of the contract. *Id.* The notice provision must by typed in underlined capital letters, or rubber-stamped prominently, on the first page of the contract. No other variation is acceptable. *See also Osteen v. T.E. Cuttino Constr. Co.,* 315 S.C. 422, 434 S.E.2d 281 (1993) (holding formal requirements of section 15–48–10(a) must be met before the dispute can be subject to arbitration); *Timms v. Greene,* 310 S.C. 469, 427 S.E.2d 642 (1993) (affirming trial court's finding that section 15–48–10(a) had not been satisfied because the contract did not contain on its first page any mention of arbitration); *Circle S. Enters., Inc. v. Stanley Smith & Sons,* 288 S.C. 428, 343 S.E.2d 45 n. 1 (Ct.App.1986) (finding a provision of a contract requiring arbitration is not enforceable under state law because notice the contract is subject to arbitration does not appear on its first page as required by section 15–48–10(a)).

Appellants assert Respondent should be equitably estopped from opposing arbitration in this case because Westmoreland prepared the partnership agreement with the defective notice of arbitration. Elements of equitable estoppel as to the party estopped are: (1) conduct by the party estopped which amounts to a false representation or concealment of material facts; (2) the intention that such conduct shall be acted upon by the other party; and (3) knowledge, actual or constructive, of the true facts. *Ingram v. Kasey's Assocs.,* 340 S.C. 98, 531 S.E.2d 287 n. 2 (2000). Essential elements of estoppel as related to the party claiming the estoppel are: (1) lack of knowledge and of means of knowledge of truth as to facts in question; (2) reliance upon conduct of the party estopped; and (3) prejudicial change in position. *Mayes v. Paxton,* 313 S.C. 109, 437 S.E.2d 66 (1993). "Estoppel cannot exist if the knowledge of both parties is equal and nothing is done by one to mislead the other." *Evins v. Richland County Historic Pres. Comm'n,* 341 S.C. 15, 15, 532 S.E.2d 876, 878 (2000).

According to Appellants, "The equitable estoppel is based upon the undisputed facts that both the party [sic] opposing arbitration previously consented in writing to such, and that party's attorney who drafted the arbitration clause now as-

serts after 19 years of silence that the document he drafted is defective. Equitable estoppel prohibits Respondent from taking that position because if [the partnership agreement] is defective, it is the fault of the Respondent who is now asserting it is defective."

Equitable estoppel does not apply to this case. First, Appellants' main problem is with Westmoreland's conduct, not with the conduct of Leutwiler or his estate. Second, Appellants present no evidence of false representation or concealment by Leutwiler. Third, the knowledge of all parties was equal and nothing was done by one to mislead the other at the time the partners entered into the partnership agreement. Finally, Appellants do not allege they have detrimentally changed their position in reliance on Leutwiler's conduct. Although Westmoreland's conduct may be problematic, Leutwiler did not induce the other partners into entering a partnership agreement with a defective notice of arbitration.

## II. Arbitration

■ Appellants argue the trial court erred in failing to order arbitration because the partnership was engaged in interstate commerce sufficient to invoke the FAA, and the FAA does not contain a notice requirement similar to section 15–48–10(a). We agree. Although the arbitration provision does not meet the technical requirements of section 15–48–10(a), the inquiry does not end there. Inextricably linked with the question of the applicability of section 15–48–10(a), is the impact of the FAA on this dispute.

### A. FAA

Beginning in the mid–1980's, the United States Supreme Court, interpreting the FAA, essentially "federalized" the law of arbitration by expanding the reach of the FAA to the full breadth of the Commerce Clause.[1] The federal policy favoring arbitration, as expressed in the FAA, is now binding even in state courts and supersedes inconsistent state law and statutes which invalidate arbitration agreements.[2] The basic

---

1. U.S. Const. art. 1, § 8, cl. 3.

2. *See* Alan S. Kaplinsky & Mark J. Levin, *Anatomy of an Arbitration Clause: Drafting and Implementation Issues Which Should be Consid-*

purpose of the FAA is to overcome state courts' refusal to enforce arbitration agreements. *Allied–Bruce Terminix Co. v. Dobson*, 513 U.S. 265, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995).

The FAA, section 2, provides that a "written provision in any maritime transaction or *a contract evidencing a transaction involving commerce* to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." *Id.* at 273, 115 S.Ct. at 839 (quoting 9 U.S.C. § 2 (1988)) (emphasis added). The United States Supreme Court has interpreted the words "involving commerce" broadly. According the Supreme Court in *Dobson*, the words "involving commerce" are the functional equivalent of "affecting commerce," which typically indicates Congress' intent to exercise its commerce power in full. *Id.* at 274, 115 S.Ct. at 839. The Supreme Court utilizes a "commerce in fact" test to determine if the transaction involves interstate commerce for the FAA to apply. *Id.; see also Towles v. United Healthcare Corp.*, 338 S.C. 29, 524 S.E.2d 839 (Ct.App.1999). In other words, the transaction must turn out, in fact, to have involved interstate commerce. *See, e.g., Roberson v. Money Tree of Alabama, Inc.*, 954 F.Supp. 1519 (M.D.Ala.1997) (finding transaction involved interstate commerce for purposes of the FAA where loan was negotiated in Alabama, loan was signed in Alabama, Money Tree was a Georgia Corporation, loans were approved and shipped from Georgia, and loan proceeds were wired from Georgia).

 Despite this expansive interpretation of the FAA, the FAA does not reflect a congressional intent to occupy the entire field of arbitration. *Volt Info. Scis. Inc. v. Board of Trs.*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). In *Volt*, the United States Supreme Court found a California statute was not pre-empted by the FAA where the parties agreed their arbitration agreement would be governed by California law. *Id.* According to the United States Supreme Court, the FAA does not require parties to arbitrate when they have not agreed to do so, nor does it prevent parties who

---

*ered by a Consumer Lender,* 1113 Practicing Law Inst./Corporate Law & Practice Course Handbook Series 655 (1999).

do agree to arbitrate from excluding certain claims from the scope of their arbitration agreement. *Id.* at 478, 109 S.Ct. at 1255. "[The FAA] simply requires courts to enforce privately negotiated agreements to arbitrate, like other contracts, in accordance with their terms." *Id.* (citations omitted).

■■ Parties are free to enter into a contract providing for arbitration under rules established by state law rather than rules established by the FAA. *Munoz v. Green Tree Fin. Corp.,* 343 S.C. 531, 542 S.E.2d 360 n. 2 (2001). If the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is consistent with the goals of the FAA, even if the result is that arbitration is stayed where the FAA would otherwise permit it to go forward. *Volt,* 489 U.S. at 479, 109 S.Ct. at 1256. *See also Ford v. NYLCare Health Plans,* 141 F.3d 243 (5th Cir.1998) (finding that parties may designate state law to govern the scope of an arbitration clause in an agreement otherwise covered by the FAA). According to the Supreme Court in *Volt,*

> [I]t does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate, so too may they specify by contract the rules under which that arbitration will be conducted.

*Volt,* 489 U.S. at 479, 109 S.Ct. at 1256. (citations omitted).

■■ While the parties may agree to enforce arbitration agreements under state rules rather than FAA rules, the FAA will preempt any state law that completely invalidates the parties' agreement to arbitrate. *See Volt, supra; Munoz, supra* n.2. *Volt* involved an arbitration agreement that incorporated state procedural rules, one of which called for arbitration to be stayed pending the resolution of a related judicial proceeding. The state rule examined in *Volt* determined only the efficient order of proceedings; it did not affect the en-

forceability of the arbitration agreement itself. *Doctor's Associates. v. Casarotto,* 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996). Generic choice of law provisions cannot be used to incorporate into an arbitration agreement a state law which would be preempted by the FAA. But, as in *Volt,* state procedural rules that do not undermine the enforceability of an otherwise valid contract to arbitrate may be deemed to have been incorporated into a contract through choice of law provisions.[3]

In *Casarotto,* the United States Supreme Court held the FAA preempted a Montana statute which conditioned the enforceability of an arbitration clause on compliance with special notice requirements. Interpreting a Montana statute similar to section 15–48–10(a), the United States Supreme Court found that courts may invalidate arbitration provisions on general contract defenses, such as fraud, duress, and unconscionability, but courts may not invalidate arbitration agreements under state laws applicable *only* to arbitration provisions. *Id.* According to the United States Supreme Court:

> By enacting § 2, we have several times said, Congress precluded States from singling out arbitration provisions for suspect status, requiring instead that such provisions be placed 'upon the same footing as other contracts.' Montana's § 27–5–114(4) directly conflicts with § 2 of the FAA because the State's law conditions the enforceability of arbitration agreements on compliance with a special notice requirement not applicable to contracts generally. The FAA thus displaces the Montana statute with respect to arbitration agreements subject to the Act.

*Id.* at 687, 116 S.Ct. at 1653.

Relying on *Casarotto,* this Court in *Soil Remediation* held that because section 15–48–10(a) singles out arbitration agreements, it directly conflicts with section 2 of the FAA. Therefore, the FAA preempts section 15–48–10(a). *Soil Remediation,* 323 S.C. at 459, 476 S.E.2d at 152. In *Muñoz, supra,* we recently stated the result in *Soil Remediation* hinged on the

---

**3.** Michael A. Hanzman, *Arbitration Agreements: Analyzing Threshold Choice of Law and Arbitrability Questions: An Often Overlooked Task,* 70 Fla. B.J. 14 (Dec. 1996).

fact that application of state law would have rendered the arbitration agreement completely unenforceable under section 15–48–10(a). *Munoz,* 343 S.C. at 539, 542 S.E.2d at 363 n. 2. "State law was therefore preempted *to the extent it would have invalidated the arbitration agreement.* The parties to a contract are otherwise free to agree that our state Arbitration Act will apply and this agreement shall be enforceable even if interstate commerce is involved." *Id.* (emphasis in original).

Under the facts of the instant case, we find the FAA controls and compel arbitration. On its facts, the instant arbitration agreement is not enforceable under South Carolina law. Thus, a partner could opt out of his agreement to arbitrate by citing the lack of a notice provision under state law. Even though the partnership agreement contains an express provision which provides that the "partnership agreement shall be governed by, and construed and enforced in accordance with the laws of the State of South Carolina," this Court's holding in *Soil Remediation* prevents the partners from "opting out" of the FAA. Furthermore, this Court in *Osteen, supra,* held a governing law clause, similar to the one in the instant case, indicates the parties' intention to have the validity and construction of the contract determined by the arbitrators according to the *substantive* law identified in the agreement. In other words, despite the inclusion of a governing law provision in an arbitration agreement, such a provision does not necessarily require the application of state, rather than federal, arbitration law. *Id.* at 426, 434 S.E.2d at 284.

We also find the partnership was engaged in interstate commerce as contemplated by the FAA. To ascertain whether a transaction involves commerce within the meaning of the FAA, the court must examine the agreement, the complaint, and the surrounding facts. *Towles v. United Healthcare Corp.,* 338 S.C. 29, 524 S.E.2d 839 (Ct.App.1999). Appellants attempt to establish interstate commerce through several affidavits. Both the United States Supreme Court and this Court have relied on affidavits when determining whether a transaction involves interstate commerce. *Circle S., supra.*

In Zabinski's affidavit, he asserts the partnership was involved in interstate commerce because: (1) the land was purchased from a Minnesota based group of investors; (2)

Bright Acres financed the purchase through a mortgage with C & S Bank of Georgia and a second mortgage from Minnesota investors; (3) Bright Acres used several out-of-state subcontractors and materials from other states; (4) the condominiums were advertised across state lines; (5) Bright Acres sold the second mortgage to First Oxford of Philadelphia, Pennsylvania; (6) extensive soil tests were conducted by a Georgia firm; (7) a land sale was financed by a Chicago bank which took a mortgage on the property; (8) Bright Acres attempted to enter into a sales contract with a Pennsylvania developer for a proposed golf course; and (9) Leutwiler spent his remaining years as a partner in Georgia. Zabinski's affidavit was disputed by affidavits given by Ann L. Stiber and Brian J. Leutwiler, which maintain there has never been partnership activities or business that directly relates to interstate commerce.

The heart of the transaction in this case is the sale and development of real property on Hilton Head Island. Bright Acres is a South Carolina partnership with its principal place of business on Hilton Head Island. The only property owned by the partnership is located on Hilton Head Island. The development of land within South Carolina' borders is the quintessential example of a purely intrastate activity. However, the transaction involved interstate commerce as contemplated by the FAA because the partnership utilized out-of-state materials, contractors, and investors. *See generally Munoz, supra* (finding interstate commerce in an installment contract case where builder was domiciled in South Carolina but assigned rights to a Delaware Creditor, agreement was prepared in Minnesota, and proceeds were disbursed from Minnesota); *Episcopal Hous. Corp. v. Fed. Ins. Co.,* 269 S.C. 631, 239 S.E.2d 647 (1977) (holding construction contract involved interstate contract where materials, equipment, and supplies were produced and manufactured out-of-state); *Circle S., supra* (finding construction contract involved ·interstate commerce where equipment, materials, and subcontractors were furnished from out-of-state). *See also Roberson, supra* (Alabama district courts find transactions between lenders and borrowers are ones "involving commerce" within meaning of the FAA).

Because of the FAA's expansive view of interstate commerce, we find the FAA covers the partnership agreement in the present case. Thus, the FAA provisions trump conflicting requirements of South Carolina law, and arbitration is required.

## B. Matters Subject to Arbitration

■ The four partners agreed in their partnership agreement that "any controversy or claim arising out of the partnership agreement" would be settled by arbitration if it could not be settled by the partnership. In their Motion to Compel Arbitration, Appellants moved the trial court to compel arbitration of any and all claims, controversies, or challenges Respondent has to the past, present, and future management plans of the partnership. Appellants also request review of all partnership actions taken in the last three years, approval of a business plan concept for the effective management of the partnership's remaining assets, payment of all appropriate expenses, and distribution of assets or proceeds to the partners. Essentially, Appellants are seeking to compel arbitration in order to wind up the partnership and to resolve all outstanding claims involving the partnership. We must, therefore, determine which claims are arbitrable.

■ The question of the arbitrability of a claim is an issue for judicial determination, unless the parties provide otherwise. *AT & T Techs., Inc. v. Communications Workers of America*, 475 U.S. 643, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (citations omitted); 4 Am.Jur.2d *Alternative Dispute Resolution* § 123 (1995). However, in deciding whether the parties have agreed to submit a particular grievance to arbitration, a court is not to rule on the potential merits of the underlying claims. *AT & T Techs.*, 475 U.S. at 649, 106 S.Ct. at 1419.

■ The policy of the United States and South Carolina is to favor arbitration of disputes. *Tritech Elec., Inc. v. Frank M. Hall & Co.*, 343 S.C. 396, 540 S.E.2d 864 (Ct.App. 2000). Arbitration is a matter of contract, and a party cannot be required to submit to arbitration any dispute which he has not agreed to submit. *Episcopal Hous., supra; Towles, supra.* Arbitration rests on the agreement of the parties, and

the range of issues that can be arbitrated is restricted by the terms of the agreement. *Simmons v. Lucas & Stubbs Assocs., Ltd.,* 283 S.C. 326, 322 S.E.2d 467 (Ct.App.1984).

To decide whether an arbitration agreement encompasses a dispute, a court must determine whether the factual allegations underlying the claim are within the scope of the broad arbitration clause, regardless of the label assigned to the claim. *Hinson v. Jusco Co.,* 868 F.Supp. 145 (D.S.C. 1994); *S.C. Pub. Serv. Auth. v. Great W. Coal,* 312 S.C. 559, 437 S.E.2d 22 (1993). Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Towles, supra.* Furthermore, unless the court can say with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the dispute, arbitration should be ordered. *Great W. Coal,* 312 S.C. at 564, 437 S.E.2d at 25. A motion to compel arbitration made pursuant to an arbitration clause in a written contract should only be denied where the clause is not susceptible to any interpretation which would cover the asserted dispute. *Tritech, supra.*

The arbitration agreement in the instant cases states that "any controversy or claim arising out of the partnership agreement" should be settled by arbitration if it cannot be settled by the partnership. Therefore, any claim pursuant to the partnership agreement is arbitrable. Further, any tort claims between the partners that relate to the partnership agreement are arbitrable.[4] Finally, the winding up of the partnership is covered by the arbitration agreement because it

---

4. Other jurisdictions provide a test to determine whether a tort claim falls within the scope of an agreement to arbitrate. According to these courts, the focus should be on the factual allegations contained in the petition rather than on the legal causes of actions asserted. The test is based on a determination of whether the particular tort claim is so interwoven with the contract that it could not stand alone. If the tort and contract claims are so interwoven, both are arbitrable. On the other hand, if the tort claim is completely independent of the contract and could be maintained without reference to the contract, the tort claim is not arbitrable. *See generally Valero Energy Corp. v. Teco Pipeline Co.,* 2 S.W.3d 576 (Tex.Ct.App.1999); *PromoFone, Inc. v. PCC Mgmt.,* 224 A.D.2d 259, 637 N.Y.S.2d 405 (1996) (holding appellant was compelled to arbitrate with a nonsignatory when issues in overall dispute were inextricably interwoven with claims against nonsignatory, and nonsignatory was closely related to signatories and was alleged to have engaged in the same improper conduct).

598

concerns issues that are the direct result of the partnership agreement.

A broadly-worded arbitration clause applies to disputes that do not arise under the governing contract when a "significant relationship" exists between the asserted claims and the contract in which the arbitration clause is contained. *Long v. Silver*, 248 F.3d 309 (4th Cir.2001). Despite South Carolina's presumption in favor or arbitration, we find the remaining third party claims are not subject to arbitration because a significant relationship does not exist between the following claims and the partnership agreement: (1) any attorney malpractice action against Westmoreland; (2) any attorney malpractice action against Massey's attorney, Bullard; and (3) any action between Massey and Leutwiler concerning the purchase agreement entered into by Massey to buy Leutwiler's interest in the partnership.

The facts underlying the attorney malpractice claims are not encompassed by the arbitration agreement. Appellants' malpractice claim against Westmoreland concerns his failure to stamp the partnership agreement with the language mandated in section 15–48–10(a), and his many alleged conflicts of interest involving the partnership. Appellants' malpractice claims against Bullard concern his alleged loyalty to Massey over his loyalty to the partnership. These malpractice claims concern the partnership only indirectly, and cannot be considered claims "arising out of the partnership agreement." Furthermore, the winding up of the partnership will involve a totally different set of facts than the facts surrounding the attorney malpractice claims.

Finally, the action between Leutwiler and Massey involves a dispute over the purchase agreement, which is completely unrelated to the partnership agreement. Leutwiler alleges Massey failed to make all payments required by a written purchase agreement. Massey and Leutwiler's estate disagree as to what percent, if any, Massey acquired in Leutwiler's original 25% of the partnership. The facts involved in this controversy are completely independent of any dispute arising out of the partnership agreement and are not arbitrable.

In 1995, we issued a memorandum opinion which decided the controversy between Leutwiler and Massey. *Leutwiler v. Massey*, 95–MO–223 (filed July 19, 1995). For the sake of judicial economy and to prevent further litigation between the parties, we will state the effect of our 1995 opinion upon the determination of the respective percentages owned by Leutwiler and Massey in the partnership. In 1995, we found that upon default Massey would be entitled to a pro rata share of the partnership interest based on the payments he made pursuant to the purchase agreement. Once Massey defaulted, he was not compelled to make further payments. Massey is entitled to have the principal payments applied to the purchase of a pro rata share of Leutwiler's total partnership interest, with that share passing to Massey, and Leutwiler retaining the portion of the partnership not paid for by Massey. Based on the purchase agreement and the amount of payments made by Massey, we find Massey owns a 36.45% interest in the partnership and Leutwiler owns a 13.55% interest in the partnership.[5]

---

5. These percentages are reflected in Massey's memorandum in support of his motion to determine his percentage interest in Bright Acres. Massey's memorandum is a correct calculation of the effect of our 1995 opinion. The percentages are based on the partnership agreement and the following calculations.

The partnership agreement stated Leutwiler agreed to sell his interest to Massey under the following terms: (1) Massy paid $110,000 for Leutwiler's partnership interest; (2) Massey paid an initial cash payment of $20,000; (3) Massey paid $2,000 per month with no interest; and (4) Massey paid $1,064.70 per month for 114 months with an interest rate of 10%, of which $78,000 was to be principal and $43,375.80 was to be interest. The purchase agreement contained a provision permitting Massey to cease making payments at any time and receive a pro rata share of the Leutwiler interest.

On October 20, 1993, Massey paid $17,207.93 to the Clerk of Court. This amount represented a judgment of $16,841.10 with the difference being for post-judgment interest and the Sheriff's collection fee. The sum deposited represented 13 payments of $1,064.70 and $3,000 in attorneys fees. On September 15, 1994, this sum deposited was reduced by one payment of $1,064.70 pursuant to an order by the trial judge. Accordingly, Massy has paid toward the principal as follows: (1) $20,000 initial cash payment; (2) $12,000 − 6 payments of $2000 with no interest; and (3) $13,017.37 − 28 payments of $1,064.70 at 10% interest. The total paid in principal was $45,017.37.

The percentage of Leutwiler's interest purchased by Massey is computed as follows: $45,017.37 = .40925 × .25 = 10.23%

## III. TRO

Appellants argue the trial court erred in issuing a TRO without providing proper notice. We agree.

■ According to Appellants, on August 12, 1999, they received a faxed copy of Respondent's Motion to Compel the Return of Funds and Deposit which provided no notice of a hearing on the motion. A status conference was held the following day at which time Appellants' attorney timely objected to the trial court ruling on any matter except arbitration, and requested the trial court not rule on any other motions without an opportunity to be heard. In his August 25, 1999, Order, Judge Kemmerlin issued a TRO, restraining the partnership from making further distributions to the partners and from paying attorney's fees until further order of the trial court. According to Appellants, their interests were prejudiced because they were not provided ten days notice. *See Dedes v. Strickland,* 307 S.C. 152, 414 S.E.2d 132 (1992); Rule 6(d), SCRCP.

Pursuant to Rule 65(b), SCRCP, a trial judge can issue a temporary restraining order without providing notice where

---

$110,000

The percentage of Leutwiler's interest retained by Leutwiler is computed as follows: $\$\ 64,982.63 = .59075 \times .25 = 14.77\%$

$110,000

Therefore, Massey has a 35.23% interest and Leutwiler has a 14.77% interest.

However, the partnership agreement provided that upon the failure of a partner to satisfy a call for capital, the partner paying such sum should be entitled to an adjustment in ownership interest from the share held by the delinquent partner. Leutwiler failed to make additional capital payments and his share was paid by Massey. The total of all additional paid in capital is $36,371.66 of which Leutwiler should have paid 14.77% or $5,372.09. The percentage adjustment is computed as follows:

Massey's payment = $\ \$\ 5,372.09 = .08266 \times .1477 = .0122$

Leutwiler's share $64,988

Thus, Massey's share = $.3523 + .0122 = 36.45\%$

and Leutwiler's share = $.1477 - .0122 = 13.55\%$

"it clearly appears from specific facts shown by affidavit or by verified complaint that immediate or irreparable injury, loss or damage will result to the applicant before notice can be served and a hearing had thereon." [6]

The granting of temporary injunctive relief is within the sound discretion of the trial court and will not be overturned absent an abuse of that discretion. *City of Columbia v. Pic–A–Flick Video, Inc.*, 340 S.C. 278, 531 S.E.2d 518 (2000). An abuse of discretion occurs where the trial court is controlled by an error of law or where the trial court's order is based on factual conclusions without evidentiary support. *Id.* The sole purpose of a temporary injunction is to preserve the status quo and thus avoid possible irreparable injury to a party pending litigation. *Powell. v. Immanuel Baptist Church*, 261 S.C. 219, 199 S.E.2d 60 (1973).

The Respondent asserted the partnership and other partners were "gutting the Partnership and making distributions improperly to themselves." Judge Kemmerlin expressed concern that if he did not restrain the partners, they may expend the remaining funds. Judge Kemmerlin had the following allegations before him when he issued the ex parte TRO: (1) Appellants allegedly paid all expenses and distributed all assets without waiting for the appointment of an arbitrator; (2) breach of fiduciary duty by Appellants; (3) partnership assets and information were being improperly withheld from Respondent; (4) Appellants refused to produce partnership records for examination by Respondent; (5) Appellants refused to obey a subpoena; (6) attorney conflict of interest; and (7) Appellants improperly distributed partnership assets.

---

6. Judge Kemmerlin's TRO did not meet all of the following requirements of Rule 65(b), SCRCP:

"Every temporary restraining order granted without notice shall be endorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall be served, together with a summons and complaint in the event no summons and complaint have previously been served in the action, ... shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period."

While Judge Kemmerlin had several allegations before him, the factual basis for the TRO was not fully developed. Therefore, a hearing on the matter was imperative. However, Rule 65(b), SCRCP states that an ex parte TRO will expire in ten days. Because more than ten days has elapsed, the TRO has expired as a matter of law and the remaining issues involving the TRO are moot.

## IV. Motion for the Return of Funds and Deposit

■■■■ Appellants argue they were prejudiced because they did not have an opportunity to demonstrate the allegations in the Motion for the Return of Funds and Deposit were false. We disagree.

On August 12, 1999, Respondent moved for the return and deposit of all funds distributed to the various partners by Massey. Respondent also moved for the appointment of a receiver. In their briefs, Appellants argue the merits of Respondent's Motion for the Return of Funds and Deposit. Specifically, Appellants contest grounds 4 through 9, and argue they were prejudiced because they were not allowed to submit affidavits contesting these grounds.

Judge Kemmerlin's August 25, 1999, Order was a ruling on a number of motions, but it was not a ruling on the Motion to Compel Return of Funds and Deposit. He references the Motion and its allegations in his August 25, 1999, Order. However, he does not specifically rule on the merits of these allegations. He simply uses the allegations as a basis to issue a TRO. Judge Kemmerlin then directs the parties to appear before him on September 9, 1999, to show cause why the TRO should not become an injunction *pendente lite,* and to discuss the appointment of a receiver. Presumably, the parties would argue the merits of the Motion at the September 9, 1999, hearing. However, Judge Kemmerlin recused himself before the September 9, 1999, hearing. The merits of the Motion were never heard and a receiver was never appointed.

Appellants were not prejudiced because a trial judge never ruled upon the allegations presented in the Motion.[7] The only

---

7. Respondent alleges Appellants were not prejudiced because all the partnership assets have been distributed. Additionally, Respondent maintains Appellants consented to a continuation of the TRO.

way Appellants could be prejudiced is by Judge Kemmerlin's issuance of a TRO. We find no prejudice because, as we stated above, the TRO has expired.

## CONCLUSION

Based on the foregoing, we hereby compel arbitration of the following issues: (1) the winding up of the partnership; (2) the partnership's selection of a managing partner; (3) any claim concerning the sale of a remaining piece of property located on Hilton Head Island, South Carolina; (4) any claim concerning the proceeds from the September 4, 1998 property sale together with all incidental issues involving the terms, conditions, and consequences of that sale and post-sale management and application of the funds to be received by the partnership in due course along with the partnership's plans for how to manage the asset if the purchaser's obligations are not timely met; and (5) any remaining claims concerning the management of the partnership. The arbitrator will distribute the remaining assets to the partners in the percentages outlined in this opinion. Therefore, we **AFFIRM** the trial court's Order denying arbitration of the attorney malpractice claims, and **REVERSE** the trial court's Order denying arbitration of the remaining claims concerning the partnership.

**AFFIRMED IN PART; REVERSED IN PART; AND ARBITRATION COMPELLED.**

MOORE, WALLER, PLEICONES, JJ., and Acting Justice J. ERNEST KINARD, Jr., concur.