**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

## THE STATE OF SOUTH CAROLINA
### In The Court of Appeals

Linda Rodarte, J. Perry Kimball, George M. Lee, III, Mena H. Gardiner, and John Love, Plaintiffs,

Of whom George M. Lee, III, Mena H. Gardiner and John Love are Appellants,

v.

University of South Carolina and University of South Carolina Gamecock Club, Respondents.

Appellate Case No. 2013-002295

───────────

Appeal From Richland County
G. Thomas Cooper, Jr., Circuit Court Judge

───────────

Unpublished Opinion No. 2015-UP-357
Heard April 21, 2015 – Filed July 15, 2015

───────────

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED**

───────────

Julius W. Babb, IV, and J. Lewis Cromer, both of J. Lewis Cromer & Associates, LLC, of Columbia, for Appellants.

Robert E. Stepp and Bess J. DuRant, both of Sowell Gray Stepp & Laffitte, LLC, of Columbia, for Respondents.

**PER CURIAM:**  Linda Rodarte, J. Perry Kimball, George M. Lee, III, Mena H. Gardiner, and John Love filed this action against The University of South Carolina and The University of South Carolina Gamecock Club (collectively, USC), alleging breach of contract.  Lee, Gardiner, and Love (Appellants) appeal the circuit court's order granting summary judgment to USC.  Appellants argue the circuit court erred by (1) finding the contract was unambiguous; (2) excluding extrinsic evidence; (3) excluding evidence of the parties' conduct; and (4) rejecting Appellants' estoppel arguments.  We affirm in part, reverse in part, and remand.

## II.    BACKGROUND FACTS

Appellants acquired Lifetime Scholarship Memberships[1] in the Gamecock Club, an organization supporting athletics at the University of South Carolina.  The Lifetime Scholarship Membership program was established by the Gamecock Club in the mid-1980s.  In exchange for donations to the Gamecock Club, the donors received lifetime rights and privileges that were memorialized in a Membership contract.  Pursuant to Exhibit A of each contract, Appellants were entitled to the following:

> --Four Season Football Tickets (Best Available)
> --Additional Four Season Football Tickets (Total of 8)
> --Assigned Reserved Parking
> --Second Priority on Away and Bowl Game Tickets
> --Tickets May Be Assigned to One Designated Heir
> --Four Season Basketball Tickets (Best Available)
> --Assigned Reserved Parking[2] at Coliseum (If Available)
> --Second Priority on Away and Tournament Game
>   Tickets
> --Second Priority on Any Tickets Involving Any Other
>   South Carolina Athletic Events

---

[1] There are two donor levels of Lifetime Memberships—Lifetime Silver Spur Members, who donate more than $40,000, and Lifetime Full Scholarship Members, who donate between $25,000 and $40,000.

[2] Lee and Love's contracts provided, "Assigned Parking at Coliseum (If Available)."

The advertising circular that introduced the Lifetime Scholarship Membership program listed "Priority on season Football Tickets and Parking" as one of the benefits of membership. A 1986 brochure described Lifetime Scholarship Membership football parking benefits as "Assigned Reserved Parking." For approximately twenty-five years, Appellants and other Gamecock Club members parked on the apron of the University's football stadium in reserved parking spaces.

Marcy Girton, the Deputy Director of Athletics for the University, averred by affidavit that on November 3, 2006, the Board of Directors of the Gamecock Club amended its Constitution and By-Laws to approve a priority point system for the allocation of benefits associated with membership in the Gamecock Club. The amendments provided that assignments for parking at home football games would be based on a member's priority point ranking.

Under the priority point system, points would be awarded as follows: (1) Gamecock Club members receive one point for every $100 donation and two points for each consecutive year of giving; and (2) Gamecock Club members receive one point for every season ticket purchased for football, baseball, and men and women's basketball. Lifetime Scholarship Members were deemed to have made donations to the Gamecock Club in the amount of cash contributions they made when they became Lifetime Scholarship Members or the amount of the value of the life insurance policies they assigned to the Gamecock Club. By letter to Lifetime Scholarship members dated March 5, 2008, from Chris Wyack, Executive Director of the Gamecock Club, USC stated "Life[time] Members are at the top of all Gamecock Club priority."

Beginning with the 2012 football season, parking on the apron around the stadium was no longer available to Gamecock Club members. Prior to the football season, Appellants were informed they could no longer park on the apron of the stadium, and they could either participate in a parking space selection process based on the priority point system or the Gamecock Club would assign their parking. Lifetime Scholarship Members were not given priority over other Gamecock Club members in the priority point system. Appellants were each permitted to select two parking spaces. Members could select reserved parking from numerous outlying USC parking facilities, including the Armory, Carolina Park at the South Carolina State Fairgrounds, and the Farmers' Market. Appellants each selected parking spaces at the Farmers' Market.

Marion Hope (Hope) testified in deposition that he participated in the negotiations when his father, Stuart Hope (Mr. Hope),[3] entered his Lifetime Scholarship Membership contract with USC on May 8, 1986.  Mr. Hope had contributed $5,000 and agreed to contribute an additional $20,000 to become a Lifetime Scholarship Member.  Hope testified a USC representative gave verbal assurances of privileges beyond those listed in Exhibit A of the contract, including eight basketball tickets (the contract said four) and top priority in the Gamecock Club. According to Hope, Mr. Hope was assured Lifetime Silver Spur Members had top priority and Mr. Hope's level, Lifetime Scholarship Membership, had second priority.

George Lee signed his contract in March 1990 and testified in deposition he was given Lifetime Scholarship Membership privileges in exchange for a life insurance policy on his life for $100,000, payable to USC.  Lee stated he received a specific parking space, space 214,[4] per a letter signed by Art Baker on behalf of USC.  By sworn affidavit, Lee averred he was given priority parking from the time he entered the contract until the summer of 2012.  Lee stated, "[t]hrough the Gamecock Club's actions[,] persons have been given priority ahead of mine and in contravention of my contract rights."  Lee claimed USC's actions violated his "rights under the contract and disregard[ed] the Gamecock Club's past course of dealing, over decades, regarding the assignment of reserved parking."

John Love testified in deposition that he sought out a Lifetime Scholarship Membership at the behest of his friends, Harry Gregory, Sr., and Harry Gregory, Jr., so they could park together next to the stadium.  Love executed his contract for a Lifetime Scholarship Membership in March 1990 in exchange for purchasing a $100,000 whole life policy and designating USC as the beneficiary.  Love had been a Full Scholarship member since 1982, when he donated $10,000 and pledged $1,000 per year.  Love testified that his communications with USC prior to executing the contract involved instructions to obtain the insurance policy and USC's assurances confirming that parking for the three spaces would be adjacent. Love testified he already had a good parking space; thus, the appeal of the Lifetime Scholarship Membership was that it would "define what my contributions for my lifetime would be to have the best priorities for tickets and parking.  So those were the gist of my conversations."

---

[3] Mr. Hope's rights and privileges under the contract passed to his named beneficiary, Mena Gardiner, at the time of his death.

[4] Lee's deposition indicates parking spot 214; his affidavit names space 314.

Between 1990 and 2011, Love parked with Harry Gregory, Sr., and Harry Gregory, Jr., on either side of him. Love testified he met with two representatives from the Gamecock Club in the spring of 2012 to verify his membership entitled him to the best available parking. Love stated, "it was not a good conversation because when I said . . . our parking is the best available[,]" the representatives said, "I think you are going to be happy, but [we] can't tell you that that is what is going to happen with you" and referred Love to the contract language.

In June 2012, Appellants filed this action, alleging USC breached the Lifetime Scholarship Membership contracts by requiring Appellants to move to parking spaces at the Farmers' Market and by not giving Appellants first priority in the selection of new parking spaces.[5] Appellants alleged their contracts entitled them to priority in parking ahead of non-lifetime donors; however, USC breached their contracts by giving numerous non-lifetime donors priority ahead of them. The parties filed cross-motions for summary judgment.[6]

On August 9, 2013, the circuit court heard the motions. Appellants argued the point system resulted in Appellants' priority being intertwined with the general populace of Gamecock Club members in priority rather than continuing as first priority within the Gamecock Club. Appellants argued the Lifetime Scholarship Membership contract unambiguously provided them with priority, or in the alternative, the contract was ambiguous.

By order filed August 27, 2013, the circuit court noted its order related only to the portion of Exhibit A to the contract addressing parking, making "no determination as to any other provision of the agreement." The court concluded the contract was unambiguous, the parole evidence rule precluded consideration of extrinsic evidence, and the parties' conduct could not be used to vary the terms of the contract. The court also found Appellants were not entitled to relief under either equitable or collateral estoppel. Thus, the court granted USC's motion for summary judgment and denied Appellants' motion for summary judgment. The court denied Appellants' motion for reconsideration. This appeal follows.

---

[5] In July 2012, Appellants filed an amended summons and complaint replacing plaintiff Mitchell Bailey with plaintiff John Love.
[6] Appellants' previous motion for summary judgment was withdrawn, and USC's motion to dismiss was denied.

## III.   STANDARD OF REVIEW

On appeal from the grant of a summary judgment motion, this court applies the same standard as that required for the circuit court under Rule 56(c), SCRCP. *Brockbank v. Best Capital Corp.*, 341 S.C. 372, 379, 534 S.E.2d 688, 692 (2000). Summary judgment is proper under Rule 56(c) when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Singleton v. Sherer*, 377 S.C. 185, 196, 659 S.E.2d 196, 202 (Ct. App. 2008).

"It is a question of law for the court whether the language of a contract is ambiguous."  *S.C. Dep't of Natural Res. v. Town of McClellanville*, 345 S.C. 617, 623, 550 S.E.2d 299, 302-03 (2001).  "[A] reviewing court is free to decide questions of law with no particular deference to the trial court."  *Hunt v. S.C. Forestry Comm'n*, 358 S.C. 564, 569, 595 S.E.2d 846, 848-49 (Ct. App. 2004).

## IV.   LAW/ANALYSIS

### A.   Ambiguity

Appellants argue the circuit court erred in holding the "assigned reserved parking" clause in their contracts was unambiguous.  We disagree.

We are bound by our supreme court's ruling in *Lee v. The University of South Carolina*, 407 S.C. 512, 757 S.E.2d 394 (2014).  In *Lee*, the court reversed the circuit court's entry of judgment for USC in a declaratory judgment action.  *Id.* at 514, 757 S.E.2d at 396.  George M. Lee, III, had been a member of the Gamecock Club for many years when, in 1990, he elevated his membership to the Lifetime Full Scholarship level by purchasing a life insurance policy and designating USC as the sole, irrevocable beneficiary.  *Id.* at 515, 757 S.E.2d at 396.  Lee entered an agreement with the Gamecock Club similar to the agreement in this case.  *Id.* at 515 n.2, 757 S.E.2d at 396 n.2.  Lee agreed to pay the policy premiums for eight years until the policy was paid up, at which time the Gamecock Club would own the policy.  *Id.* at 515, 757 S.E.2d at 396.  The agreement also stated Lee would "have the *opportunity to purchase tickets* entitled to the Gamecock Level or membership presently held."  *Id.* at 516, 757 S.E.2d at 396.  At the end of the eight year period, the Gamecock Club notified Lee that it had not realized the cash necessary to insure the face value of the policy and Lee was required to either revert back to Full Scholarship level, contribute $500 or more per year to remain a

Lifetime Full Scholarship member, or continue paying the premium.  *Id.*  Lee began paying $500 per year.  *Id.*

In 2008, USC instituted a Yearly Equitable Seating (YES) program, requiring all Gamecock Club members, regardless of membership level, to pay a seat license fee each year for the opportunity to purchase their seats.  *Id.* at 516, 757 S.E.2d at 397. Lee was required to pay $325 per year for each of his eight seats.  *Id.*  Lee filed a declaratory judgment action to determine whether he was entitled to purchase season tickets without paying the seat license fees.  *Id.*  The circuit court found the agreement was unambiguous and even though Lee was required to pay the seat license fee, he retained the opportunity to purchase season tickets; thus, USC complied with the contract.  *Id.* at 517, 757 S.E.2d at 397.

Our supreme court reversed, finding the agreement was unambiguous, but the seat license fee requirement constituted the imposition of an additional term to the agreement that the parties did not agree upon.  *Id.* at 518, 757 S.E.2d at 398.  The court held USC was required by the terms of the agreement to permit Lee the opportunity to purchase tickets without being subjected to any other conditions, including the payment of seat license fees.  *Id.*  Thus, although the supreme court ultimately reversed the circuit court in *Lee*, we are bound by the supreme court's finding that the substantially identical contract was unambiguous.[7]  Accordingly, we affirm the circuit court's finding that the contract was unambiguous.

**B.    Extrinsic Evidence**

---

[7] We find no merit in Appellants' reliance on this court's unpublished opinion in *Rosen v. The University of South Carolina*, Op. No. 2011-UP-331 (S.C. Ct. App. filed June 27, 2011), finding the same contract was ambiguous.  *See* Rule 220(a), SCACR (providing unpublished opinions have no precedential value); Rule 268(d)(2), SCACR ("Memorandum opinions and unpublished orders have no precedential value and should not be cited except in proceedings in which they are directly involved.").  Further, we find no merit in Appellants' reliance on the Richland County circuit court's order in *Timmons v. The University of South Carolina*, 2012-CP-40-03931.  *See* 21 C.J.S. *Courts* § 212 (2006) ("Trial or inferior court decisions are not precedents binding other courts, including appellate courts or other judges of the same trial court." (footnotes omitted)).

Appellants argue the circuit court erred in refusing to consider extrinsic evidence. We disagree.

"[E]xtrinsic evidence may only be considered if the contract is ambiguous." *Preserv. Capital Consultants, LLC v. First Am. Title Ins. Co.*, 406 S.C. 309, 320, 751 S.E.2d 256, 261 (2013) (citing *Duncan v. Little*, 384 S.C. 420, 425, 682 S.E.2d 788, 790 (2009)). "Where a written instrument is unambiguous, parol evidence is inadmissible to ascertain the true intent and meaning of the parties. *McGill v. Moore*, 381 S.C. 179, 188, 672 S.E.2d 571, 576 (2009). Because we affirm the circuit court's finding that the contract is unambiguous, we likewise affirm the circuit court's refusal to consider extrinsic evidence.

## C.    The Parties' Conduct

Appellants also argue the circuit court erred in holding the parties' conduct after the execution of the contract could not be considered to determine their intent. We disagree.

Evidence of custom and usage may not be used to contradict, vary, or explain the terms of an unambiguous contract. *Autrey v. Bell*, 114 S.C. 370, 374, 103 S.E. 749, 750 (1920); *see Town of McClellanville*, 345 S.C. at 623, 550 S.E.2d at 303 ("Once the court decides that the language is ambiguous, evidence may be admitted to show the intent of the parties."). Because we affirm the circuit court's finding regarding ambiguity, we likewise affirm the circuit court's refusal to consider the parties' conduct after the execution of the contract in determining the parties' intent.

## D.    Estoppel

Appellants lastly argue the circuit court erred in rejecting their estoppel arguments. We agree as to equitable estoppel and disagree as to collateral estoppel.

## 1.    Equitable Estoppel

The elements of equitable estoppel for the party asserting the estoppel are the following: (1) a lack of knowledge and of a means of knowing the truth as to the facts in question; (2) a reliance upon the conduct of the estopped party; and (3) a prejudicial change in position. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 589, 553 S.E.2d 110, 114 (2001). The elements as to the party being estopped are

the following: (1) conduct by the estopped party amounting to a false representation or a concealment of material facts; (2) an intention that such conduct be acted upon by the other party; and (3) actual or constructive knowledge of the true facts. *Id.* The party asserting estoppel carries the burden of proof. *Blue Ridge Realty Co. v. Williamson*, 247 S.C. 112, 122, 145 S.E.2d 922, 927 (1965).

The circuit court rejected Appellants' equitable estoppel claim. In reversing the circuit court, we again rely on recent South Carolina Supreme Court precedent. In *Springob v. The University of South Carolina*, 407 S.C. 490, 493, 757 S.E.2d 384, 385-86 (2014), the court considered the plaintiffs' challenges to the Gamecock Club's imposition of premium seating fees on Gamecock Club members. The premium seating was originally offered to high-level Gamecock Club members via a brochure offering the seats and other amenities, including preferred parking, access to a private club in the arena, and the option to purchase the best tickets to all events held at the arena. *Id.* at 493-94, 757 S.E.2d at 386. The brochure offered the opportunity to purchase the tickets over five years at $5,000 per seat in the first year and $1,500 per seat in years two through five. *Id.* at 494, 757 S.E.2d at 386. USC employees allegedly promised the plaintiffs that after year five, they would only have to pay the face value of the season tickets and maintain their Gamecock Club memberships to retain the premium seats. *Id.* After the fifth year, USC requested a $1,500 per seat fee and informed the plaintiffs they would be required to pay $1,500 per seat each year to retain the premium seating. *Id.* The plaintiffs filed an action alleging breach of contract, and the circuit court granted USC's motion for summary judgment, finding that due to the absence of a written contract between the parties, the statute of frauds barred the plaintiffs' claims. *Id.*

Our supreme court affirmed in part, finding the circuit court correctly found the agreement was barred by the statute of frauds. *Id.* at 495, 757 S.E.2d at 386. However, the court reversed in part and remanded, finding there was a factual issue as to whether USC was equitably estopped from asserting the statute of frauds as a defense based on an alleged oral promise that the plaintiffs would not have to pay the fee beyond year five. *Id.*

Taking the evidence in the light most favorable to Appellants, we find there was proof supporting Appellants' estoppel claim, including Appellants' affidavits and depositions, which indicate Appellants relied on USC's assurances of first and second priority "always" in exchange for the increased donations made to USC. This is sufficient to create an issue of material fact as to whether Appellants suffered a detrimental change in reliance on the representations. *See id.*, 407 S.C.

at 498, 757 S.E.2d at 388 (finding a fact question existed, which precluded summary judgment on the Gamecock Club members' estoppel claim based on oral representations by USC).  Thus, we reverse and remand, finding a factual issue exists in this case as to whether USC was equitably estopped from denying Appellants the highest priority to available parking as Lifetime Scholarship Members.

## 2.    Collateral Estoppel

Appellants argue USC is collaterally estopped from asserting the term "assigned reserved parking" is unambiguous because the issue was litigated in *Rosen*.  We disagree.

"Collateral estoppel occurs when a party in a second action seeks to preclude a party from relitigating an issue which was decided in a previous action."  *S.C. Prop. & Cas. Ins. Guaranty Ass'n v. Wal-Mart Stores, Inc.*, 304 S.C. 210, 213, 403 S.E.2d 625, 627 (1991).  "The party asserting collateral estoppel must demonstrate that the issue in the present lawsuit was: (1) actually litigated in the prior action; (2) directly determined in the prior action; and (3) necessary to support the prior judgment."  *Carolina Renewal, Inc. v. S.C. Dep't of Transp.*, 385 S.C. 550, 554, 684 S.E.2d 779, 782 (Ct. App. 2009).

We find the issue decided in *Rosen* involved the ambiguity of the contract as to whether USC could charge a fee for parking rather than whether USC could change parking spots and priorities, which is the issue this action.  Thus, Appellants have not established the elements of collateral estoppel.

## V.    CONCLUSION

We affirm the circuit court's findings as to the ambiguity of the contract, the admissibility of extrinsic evidence and the parties' conduct after the execution of the contract, and collateral estoppel.  However, as to equitable estoppel, we reverse and remand to the circuit court.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

**SHORT, LOCKEMY, and McDONALD, JJ., concur.**