592 S.E.2d 50

**James C. THORNTON, M.D., Respondent,**

v.

**TRIDENT MEDICAL CENTER, L.L.C., d/b/a Trident Medical Center, Appellant.**

**No. 3706.**

Court of Appeals of South Carolina.

Submitted Nov. 4, 2003.

Decided Dec. 8, 2003.

Rehearing Denied Jan. 22, 2004.

92

Allan Shackelford, of Greensboro; and James L. Gale, of Raleigh, for appellant.

G. Dana Sinkler, of Charleston, for respondent.

ANDERSON, J.:

Trident Medical Center (Trident) appeals the circuit court's finding that the agreement between Trident and James C. Thornton does not involve interstate commerce and, therefore, is not subject to the Federal Arbitration Act, 9 U.S.C. § 2 (1999). We reverse.

## FACTS/PROCEDURAL BACKGROUND

In 1999, Trident was suffering from a shortage of qualified physicians in its cardiovascular surgery group, South Carolina Cardiovascular Associates ("SCCA"). To alleviate this shortage, Trident began an effort to recruit physicians from other parts of the country to join SCCA. To entice physicians to move to Charleston, Trident offered substantial financial incentives that would not only cover the expenses of relocation but would provide bonuses and a guaranteed income stream for a period of time after their arrival.

Dr. James Thornton (Thornton) was one of the physicians Trident was able to attract to Charleston. In May 1999, Thornton and Trident entered into a "recruiting agreement" in which Thornton agreed to relocate his medical practice as a cardiovascular surgeon from Grand Rapids, Michigan to Charleston. In addition to the principal agreement under which Thornton agreed to relocate to Charleston and maintain his practice there for at least four years, the recruiting agreement contained four addenda: (1) a net collectable revenue guarantee which provided Thornton with a guaranteed income for twenty-four months; (2) a signing bonus; (3) a relocation agreement for payment of moving expenses; and (4) an agreement providing that Thornton was being recruited into the existing practice of SCCA.

Payment of all the financial incentives to Thornton under this agreement was contingent upon Thornton maintaining his practice in Charleston for at least four years. If he failed to do so, the payments made to Thornton under the agreement had to be repaid to Trident. Further, the agreement read: "In the event any dispute shall arise concerning any aspect of this Agreement, such dispute shall be submitted to final and binding arbitration in accordance with rules established by the American Arbitration Association."

Thornton moved to Charleston and joined SCCA in August 1999. However, he left the practice and relocated to Pennsylvania before the end of his four-year commitment. Thornton claimed he was excused from his obligations under the recruiting agreement and refused to repay any of the financial incentives he had received from Trident.

Thornton brought the present declaratory judgment action seeking a determination that the arbitration provision contained in the recruiting agreement was unenforceable. The trial court found the provision (1) did not satisfy the requirements set out in § 15–48–10 of the South Carolina Uniform Arbitration Act, and (2) was not enforceable under § 2 of the Federal Arbitration Act ("FAA"), because the transaction between the parties did not involve interstate commerce.

## STANDARD OF REVIEW

Determinations of arbitrability are subject to de novo review. *Stokes v. Metropolitan Life Ins. Co.*, 351 S.C. 606, 571 S.E.2d 711 (Ct.App.2002). Nevertheless, a circuit court's factual findings will not be reversed on appeal if there is any evidence reasonably supporting the findings. *McMillan v. Gold Kist, Inc.*, 353 S.C. 353, 577 S.E.2d 482 (Ct.App. 2003); *Evans v. Accent Manufactured Homes, Inc.*, 352 S.C. 544, 575 S.E.2d 74 (Ct.App.2003); *Liberty Builders, Inc. v. Horton*, 336 S.C. 658, 521 S.E.2d 749 (Ct.App.1999). The question of the arbitrability of a claim is an issue for judicial determination, unless the parties provide otherwise. *Zabinski v. Bright Acres Assocs.*, 346 S.C. 580, 553 S.E.2d 110 (2001); *Evans*, 352 S.C. at 549, 575 S.E.2d at 76; *see also Vestry and Church Wardens v. Orkin Exterminating Co.*, 356 S.C. 202, 588 S.E.2d 136 (2003) (whether claim is subject to arbitration is issue for judicial determination, unless parties have agreed otherwise).

## LAW/ANALYSIS

The parties do not dispute the trial court's finding that the arbitration clause contained in the recruiting agreement is unenforceable under the South Carolina Uniform Arbitration Act, S.C.Code Ann. §§ 15–48–10 to –240 (Supp.2002). If, however, the agreement involves interstate commerce, the

FAA applies and trumps the state arbitration laws. *See Doctor's Assocs., Inc. v. Casarotto,* 517 U.S. 681, 116 S.Ct. 1652, 134 L.Ed.2d 902 (1996); *Soil Remediation Co. v. Nu-Way Envtl., Inc.,* 323 S.C. 454, 476 S.E.2d 149 (1996).

The FAA provides: "A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The words "involving commerce" have been interpreted by the United States Supreme Court as being the functional equivalent of "affecting commerce"—words signaling "an intent to exercise Congress' commerce power to the full." *Allied-Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995); *see also Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56, 123 S.Ct. 2037, 2040, 156 L.Ed.2d 46 (2003) ("We have interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'—words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."); *Blanton v. Stathos,* 351 S.C. 534, 540, 570 S.E.2d 565, 568 (Ct.App.2002) ("The United States Supreme Court has held that the phrase 'involving commerce' is the same as 'affecting commerce,' which has been broadly interpreted to mean Congress intended to utilize its powers to regulate interstate commerce to its full extent."). "Because the statute provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually in commerce—that is, within the flow of interstate commerce." *Citizens Bank,* 539 U.S. at 56, 123 S.Ct. at 2040 (internal quotation marks and citations omitted).

 Thornton claims the recruiting agreement does not evidence interstate commerce and, consequently, the FAA does not apply. We disagree.

 In all cases, determination of whether a transaction involves interstate commerce depends on the facts of the case. *Zabinski v. Bright Acres Assocs.,* 346 S.C. 580, 594, 553 S.E.2d

110, 117 (2001) ("To ascertain whether a transaction involves commerce within the meaning of the FAA, the court must examine the agreement, the complaint, and the surrounding facts."). Thornton argues the recruiting agreement did not involve interstate commerce because it only concerned the performance of his duties as a physician providing medical services within South Carolina.

Thornton is correct in urging this Court to focus upon what the terms of the contract specifically require for performance in determining whether interstate commerce is involved. Our courts consistently look to the essential character of the contract when applying the FAA.

In *Mathews v. Fluor Corp.*, our Supreme Court found interstate commerce was not involved in a contract for the sale of land in South Carolina to out-of-state parties—even though, incident to the sale, the parties obtained the services of a North Carolina engineer and financing from a Pennsylvania lender. *Mathews v. Fluor Corp.*, 312 S.C. 404, 440 S.E.2d 880 (1994), *overruled by Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 542 S.E.2d 360 (2001) (overruling *Mathews* "to the extent it considered whether the parties contemplated interstate commerce as a factor in determining if the FAA applied."). The Court held the transaction was outside the scope of the FAA because it was "unable to discern from the evidence presented whether the contract *required* respondent to administer anything related to interstate commerce." *Mathews*, 312 S.C. at 407, 440 S.E.2d at 882 (emphasis in original). *See also Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 542 S.E.2d 360 (2001) (finding interstate commerce involved in a construction contract where builder was domiciled in South Carolina, but, under the contract, assigned rights to a Delaware creditor); *Soil Remediation Co. v. Nu–Way Envtl., Inc.*, 323 S.C. 454, 476 S.E.2d 149 (1996) (holding interstate commerce involved in contract requiring removal of water and sludge from property in South Carolina to a facility in North Carolina); *Timms v. Greene*, 310 S.C. 469, 427 S.E.2d 642 (1993) (stating that a contract between a nursing home and patient did not involve interstate commerce, despite the fact that the nursing home was a division of a Delaware partnership, marketed its services to persons residing outside of the state, and purchased the majority of its supplies and equipment from out-of-state;

the Court reasoned that the performance of the contract—the provision of patient-resident services in South Carolina—did not require any activities in interstate commerce); *Episcopal Hous. Corp. v. Federal Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977) (concluding performance required under a contract for the construction of an eighteen-story building involved interstate commerce because "[i]t would be virtually impossible to construct" such a building "with materials, equipment and supplies all produced and manufactured solely within the State of South Carolina."); *Blanton v. Stathos*, 351 S.C. 534, 541, 570 S.E.2d 565, 569 (Ct.App.2002) (determining that a contract for design and architectural services in the construction of a restaurant in South Carolina involved interstate commerce because " 'the contract not only contemplated the use of materials manufactured outside the state of South Carolina, but realistically the project could not be constructed without the use of materials in interstate commerce.' ").

In the present case, performance of the recruiting agreement requires activity involving interstate commerce. Contrary to Thornton's assertions, the subject matter of the contract clearly extends beyond Thornton's obligation to provide medical services in South Carolina. Thornton was recruited and agreed to move from one state to another. An essential requirement for performance under the agreement was Thornton's relocation from Michigan to South Carolina within a fixed period of time. Thornton was a resident of Michigan at the time the contract was entered. The contract recites that Thornton will be compensated for expenses incurred in moving his personal effects and household furnishings to South Carolina. Thornton accepted money to defray the cost of the move and agreed to repay these relocation expenses if he failed to maintain his practice in Charleston for four years. The contract terms provided for Trident's payment of money to induce the relocation and Thornton's promise to repay the money should he fail to perform fully under the contract. By the terms of the recruiting agreement, Thornton was obligated to relocate his practice from Michigan to South Carolina. Trident, in turn, was obligated to reimburse Thornton for expenses incurred in the transfer of his practice across state lines. After Thornton's relocation to South Carolina, he was then bound by the terms of the

agreement to remain in the state as a practicing physician for at least four years, effectively preventing him from working in any other state during that time. The contract was denominated as and was intended as a recruiting agreement to induce Thornton's move across state lines. The express purpose of the recruiting agreement was to provide a monetary incentive, consisting of multiple related promises, to induce Thornton to relocate his professional medical services practice from Michigan to South Carolina.

Thornton contends the present case is analogous to and controlled by the United States Supreme Court's decision in *Bernhardt v. Polygraphic Co.,* 350 U.S. 198, 76 S.Ct. 273, 100 L.Ed. 199 (1956). We disagree. First, we note that *Bernhardt* was decided over forty-five years ago. The law of arbitrability was nascent in 1956 and has evolved and maturated extant. Moreover, *Bernhardt* differs factually from the instant case. In *Bernhardt,* plaintiff sought to invoke the arbitration act with respect to an employment contract entered into in New York, but which was to be performed in Vermont. *Id.* at 199, 76 S.Ct. 273. The Court held that the FAA did not apply because the contract did not evidence " 'a transaction involving commerce.' " *Id.* at 200, 76 S.Ct. 273. The Court's finding was based upon the absence of any proof demonstrating that plaintiff "while performing his duties under the employment contract was working 'in' commerce, was producing goods for commerce, or was engaging in activity that affected commerce." *Id.* at 201, 76 S.Ct. 273.

Unlike the recruiting agreement in the case *sub judice,* the agreement in *Bernhardt* did not contemplate any actions affecting commerce outside of Vermont. Performance under the contract in *Bernhardt* was—by its terms—confined to a single state.

The case of *Selma Med. Ctr., Inc. v. Fontenot,* 824 So.2d 668 (Ala.2001), is instructive. The contract at issue in *Selma* (1) required two physicians to relocate their medical practices from one state to another; (2) provided guaranteed gross receipts or income for a certain period of time after relocation, with the stipulation that if the net collectible revenue exceeded $500,000 during that period, the physicians would repay the hospital the difference; (3) provided for payment of certain

sums to assist in relocation expenses and start-up costs; and (4) contained a provision requiring arbitration in accordance with the rules of the American Arbitration Association. The similitude of the contract in *Selma* and the contract in the present case is striking.

A dispute arose when the hospital claimed, but the physicians disputed, that the physicians owed the hospital excess revenue collected during the guarantee period. Concordant with Thornton, the Alabama physicians challenged the arbitration agreement and attempted to have the court disregard the clear interstate aspect of the agreement and concentrate solely on medical services to be provided in-state. South Carolina and Alabama each have a statute that places certain requirements on arbitration agreements if they are to be enforced. Thus, like the case at bar, if the FAA applied, Alabama's statutory requirement for arbitration agreements would be preempted.

In determining that the arbitration provisions contained within the physician recruitment agreements were governed by the FAA, the *Selma* court cited the three categories of activity that Congress can regulate pursuant to the Commerce Clause, namely: "(1) the use of the channels of interstate commerce; (2) *the instrumentalities of interstate commerce or persons or things in interstate commerce;* and (3) those activities having a substantial effect on interstate commerce." *Id.* at 674 (emphasis in original). The court concluded that, in the context of the physician recruitment agreement at issue in *Selma,* interstate commerce was involved because "the actual persons and things involved are themselves within the flow of commerce." *Id.* at 674 (internal quotations omitted). The court explained:

> The Physicians entered the flow of interstate commerce when they moved from South Carolina to Alabama. In fact, the sole purpose of the Agreements was to place the Physicians within the current of commerce and to move them to Alabama. . . . Accordingly, when the Physicians moved across state lines, they became "persons . . . in interstate commerce." As part of the flow of commerce, then, the Physicians were properly subject to congressional regulation.

The flow of commerce begins before, and ends after, the actual movement across State lines, in order to fulfill the purpose of the overall transaction.....

. . . .

The Agreements required the Physicians to move themselves and their medical practices from South Carolina to Selma, Alabama, to provide anesthesia services to patients in the Selma community. Thus, the agreements were themselves an integral part of the Physicians' movement in the flow of commerce, subjecting their personal-service contracts to the jurisdiction of the FAA.

*Id.* at 675 (citations omitted).

■ Having determined the physicians were part of the flow of interstate commerce, the *Selma* court did not need to decide whether the physician recruitment agreements substantially affected commerce. "When a case involves allegations of the use of the instrumentalities of interstate commerce, or persons or things in interstate commerce, a court need not reach the question whether the underlying transaction 'substantially affects' interstate commerce, because such persons and things, by definition, substantially affect—because they are components of—interstate commerce." *Id.* at 674 (internal quotations omitted).

The *Selma* court's logic and analysis apply equally here and are in full accord with South Carolina case law. Irrefutably, there is a substantial impact on interstate commerce: (1) money was paid and is now owed as a result of recruiting across state lines; (2) factually, the record is replete with movement across state lines; and (3) negotiation, bargaining, and completion of an agreement was within the rubric of interstate commerce. The reach of the FAA, as explicated by the Commerce Clause, encapsulates the Trident–Thornton contract.

## *CONCLUSION*

We conclude the recruiting agreement entered into between Thornton and Trident involved interstate commerce. Concomitantly, the FAA governs the agreement in this case and compels arbitration. Accordingly, the order of the trial court is

**REVERSED.**

GOOLSBY and CONNOR, JJ., concur.