736 S.E.2d 274

Justin O'Toole LUCEY and Justin O'Toole
Lucey, P.A., Appellants,

v.

Amy MEYER, Respondent,

and

Lorcan Lucey, GMAC Mortgage Corporation, Citimortgage,
Inc., and John Doe Finance, Third Party Defendants.

No. 4960.

Court of Appeals of South Carolina.

Heard Jan. 26, 2012.
Decided March 28, 2012.
Withdrawn, Substituted and Refiled Oct. 24, 2012.
Rehearing Granted Oct. 24, 2012.

124

Cherie Blackburn, of Charleston, for Appellants.

Nancy Bloodgood and Lucy C. Sanders, both of North Charleston, for Respondent.

LOCKEMY, J.

In this civil action involving an employment contract, Justin O'Toole Lucey and Justin O'Toole Lucey, P.A. (Firm) (collectively Appellants) appeal the trial court's denial of their motion to compel arbitration. Appellants contend the trial court erred in: (1) finding the Federal Arbitration Act (FAA) did not apply because the relationship between Firm and Amy Meyer did not involve interstate commerce; (2) finding the arbitration clause was unconscionable; (3) striking the entire arbitration clause when it was more appropriate to sever the alleged unconscionable portion and compel arbitration; and (4) finding the South Carolina Arbitration Act (SCAA) applicable to the contract. We reverse.

## FACTS

Meyer began practicing law in 2002 and is licensed to practice law only in South Carolina. Prior to joining Firm, Meyer was employed as an Assistant Solicitor for the Ninth Circuit, specializing in white collar crime, but had no civil trial experience. She also practiced public accounting for 6 years as a certified public accountant before going to work with the Solicitor's Office. In January 2006, Firm hired Meyer as an associate attorney.

In June of 2006, Meyer and Firm executed an employment agreement (2006 agreement). Explaining the purpose of the 2006 agreement, the beginning paragraph stated:

As I have several times told you I would, I am writing, albeit belatedly, to confirm the terms of the offer I gave you previously, and several modifications since. With the possible exception of some of the legalese, this is an attempt to put into writing the matters we have previously discussed and agreed to. Please feel free to clarify anything that I misstate.

The 2006 agreement contained an arbitration clause in the middle of the second page in regular type which stated:

Any disputes arising in any way related to the matters set forth herein will be submitted to confidential, binding arbitration under expedited and abbreviated procedures, with the parties being the only witnesses called in person. If we are unable to agree on an arbitrator, I will choose one, you will choose one, and the two will choose a third.

A base salary and bonus structure for contingency cases along with other benefits were also included in the 2006 agreement. The paragraph preceding the signature line stated:

Please acknowledge receipt of this communication when you receive it. After spending some time reviewing it, if you are in agreement with this, please so indicate by counter-signing below and returning to me at your convenience. If you need a meeting to discuss, just let me know.

Under "Subsequent Modifications," the 2006 agreement listed additional benefits to Meyer, including an increased bonus of fifteen percent on a case referred to as the Harper case and a

graduated trial bonus on cases which Meyer shared the work with Lucey in getting ready for trial.

The 2006 agreement specifically referenced certain cases that Meyer would be working on, including the Cusack, Harper, Shoshan, Hanson, and Turner cases. Appellants allege each of these cases involved interstate commerce. They state Shoshan was an employment lawsuit against a non-South Carolina resident car parts manufacturing subsidiary of a German company which had a North Charleston factory. Turner was a partnership/employment lawsuit involving a dental student who had been marketed a dental practice by a Georgia professional practice referral service and who obtained a loan from a Georgia bank. Harper involved a treating doctor who resided in and was deposed in Florida. Firm's primary liability expert for the Harper case resided in and was deposed in Georgia, while another of Firm's experts for the case resided in and was deposed in California. Appellants also allege that most of this out-of-state work was handled by Meyer.

In May of 2007, Firm and Meyer amended the 2006 agreement (2007 amendment) to address Meyer's salary bonus for work on a complex construction defect case (the Ocean Club case) involving a construction project on the Isle of Palms near Charleston, SC. After being provided a draft of the 2007 amendment for review, Meyer crossed out and initialed certain language to which she objected and then signed the document. Appellants stated Meyer was not spearheading the Ocean Club case.

Firm's primary client in the Ocean Club case was the Ocean Club Horizontal Property Regime, which was composed of homeowners located in various states. On February 2, 2009, Meyer prepared a summary of the travel expenses incurred in connection with the case, showing repeated travel outside of South Carolina. Further, documentation was presented showing many out-of-state depositions in which Meyer participated. During Meyer's work for this case, Firm made intermittent payments toward her salary bonuses. On July 20, 2009, the Ocean Club case was settled, and on July 22, 2009, Meyer's employment was terminated.

In July of 2009, Meyer began making demands for vacation, 401K money, and bonus money allegedly due under the Ocean Club case. In response, Firm filed an arbitration proceeding on October 22 with National Arbitration and Mediation, Inc. (NAM). Meyer did not respond to the NAM arbitration filing and sent a draft complaint to Appellants on October 30, 2009. On November 2, 2009, Appellants filed a complaint, a motion for a temporary restraining order and preliminary injunction, and a motion to compel arbitration. Appellants state they filed the complaint in an effort to prevent the filing of the draft complaint from Meyer, because the draft complaint contained confidential information about Firm's clients and disregarded the binding arbitration clause contained in the 2006 agreement. On November 30, 2009, Meyer filed an answer, counterclaims, and third party complaint. Meyer asked for an award of $1.7 million for the value of her time on the Ocean Club case.

After a hearing on December 9, 2009, the trial court denied the motion to compel arbitration. The trial court made the following conclusions: (1) the arbitration clause did not meet the requirements of SCUAA; (2) the employment contract did not involve commerce within the meaning of the FAA; (3) the arbitration clause at issue was further void on equitable grounds; and (4) there were differences in compelling arbitration in real estate development and construction cases under the FAA and compelling arbitration for personal service contracts.

Appellants filed a Rule 59(a) motion asking the trial court to reconsider the following: (1) the determination that the FAA did not apply, because the trial court improperly focused on Meyer's activities, rather than the activities of the Firm; (2) the delegation to Meyer's counsel of the ruling on the issue of whether the arbitration clause was unconscionable; and (3) the failure to recognize or evaluate the factors which render arbitration clauses reasonable and conscionable, especially as between sophisticated parties. However, during the hearing on the motion for reconsideration, Appellants failed to pursue their second argument regarding improper delegation. The trial court issued a Form 4 denial of the Appellants' 59(a) motion for reconsideration, and this appeal followed.

## ISSUES ON APPEAL

1.  Did the trial court err in its determination the employment contract between the parties did not involve interstate commerce within the meaning of the FAA such that the FAA does not apply?

2.  Did the trial court err in its determination that the arbitration clause at issue is unconscionable, thus it is invalid and not enforceable?

3.  Did the trial court err in failing to sever the "limitation of live witnesses" portion of the arbitration clause and then enforce the remainder?

4.  Did the trial court err in its determination that the SCUAA applies to the agreement between the parties and that the employment agreement is not in compliance with such act?

## STANDARD OF REVIEW

■ " 'Arbitrability determinations are subject to de novo review.' " *Davis v. KB Home of South Carolina, Inc.*, 394 S.C. 116, 123, 713 S.E.2d 799, 803 (Ct.App.2011) (quoting *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 22, 644 S.E.2d 663, 667 (2007)). " 'Nevertheless, a circuit court's factual findings will not be reversed on appeal if any evidence reasonably supports the findings.' " *Id.* (quoting *Simpson*, 373 S.C. at 22, 644 S.E.2d at 667).

## LAW/ANALYSIS

### I. Timeliness of Appellants' Notice of Appeal

■ As a threshold procedural matter, we will address Meyer's argument that Appellants' Rule 59(a) motion for reconsideration was an insufficient and improper way to request review of a trial court's denial of a motion to compel arbitration. Thus, Meyer contends this is an untimely appeal because the improper motion did not toll the time for appeal from the arbitration order. We disagree.

Appellants' motion stated they are requesting reconsideration pursuant to Rule 59(a), SCRCP. Rule 59(a) states:

Grounds. A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the State; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in the courts of the State. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

The grounds for Appellants' motion are stated as follows: (1) the trial court incorrectly focused on Meyer's activities, rather than the activities of the Firm when determining whether the FAA applied; (2) the trial court delegated the ruling on the issue of whether the arbitration clause was unconscionable to Meyer's counsel; and (3) the trial court failed to recognize or evaluate the factors which render arbitration clauses reasonable and unconscionable, especially as between sophisticated parties. The Appellants then filed a memorandum in support of their motion for reconsideration which expands upon their three grounds.

"'A timely post-trial motion, including a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP, stays the time for an appeal for all parties until receipt of written notice of entry of the order granting or denying such motion.'" *Camp v. Camp*, 386 S.C. 571, 575, 689 S.E.2d 634, 636 (2010) (quoting *Elam v. South Carolina Dep't of Transp.*, 361 S.C. 9, 15, 602 S.E.2d 772, 775 (2004)); Rule 203(b)(1), SCACR; Rule 59(f), SCRCP. "Rule 7(b)(1), SCRCP requires that motions 'shall state with particularity the grounds therefor, and shall set forth the relief or order sought.'" *Camp*, 386 S.C. at 575, 689 S.E.2d at 636. "The particularity requirement 'is to be read flexibly in recognition of the peculiar circumstances of the case.'" *Id.* (quoting *Cambridge Plating Co., Inc. v. Napco, Inc.*, 85 F.3d 752, 760 (1st Cir.1996)). "'By requiring notice to the court and the opposing party of the basis for the motion, rule 7(b)(1) advances the policies of reducing prejudice to either party and assuring that the court can comprehend the basis of the motion and deal with it fairly.'"

*Id.* (quoting *Calderon v. Kansas Dep't of Soc. & Rehab. Servs.,* 181 F.3d 1180, 1186 (10th Cir.1999)). However, when neither party is prejudiced and the court is able to deal fairly with a motion for reconsideration, applying an overly technical application does not serve the purpose of Rule 7(b)(1), SCRCP. *Id.* at 575–76, 689 S.E.2d at 636–37.

When the trial court is able to discern the relief requested, "[i]t is the substance of the requested relief that matters 'regardless of the form in which the request for relief was framed.' " *Richland Cnty. v. Kaiser,* 351 S.C. 89, 94, 567 S.E.2d 260, 262 (Ct.App.2002) (quoting *Standard Fed. Sav. & Loan Ass'n v. Mungo,* 306 S.C. 22, 26, 410 S.E.2d 18, 20 (Ct.App.1991)); *see Fields v. Reg'l Med. Ctr. Orangeburg,* 363 S.C. 19, 27, 609 S.E.2d 506, 510 (2005) (holding it was proper to treat plaintiff's written motion as a Rule 59(e) motion to the extent the motion addressed the trial court's evidentiary rulings, which the plaintiff challenged in her briefly stated oral motion at the end of the trial, even though it was erroneously captioned as a motion for new trial).

At the hearing for reconsideration, Meyer raised her contention that the Appellants filed their motion improperly pursuant to Rule 59(a), instead of Rule 59(e). The court responded:

> I'm not trying to be smart with you, but if I made a mistake I'll correct it irrespective of whether it's 59(a) or 59(e). Okay? So base your argument on that, okay. That's my concern if whether I made a mistake and that's what the motion for reconsideration—generally, it's for the Courts to correct themselves. And I have done that on, I won't say several occasions, but I have corrected myself on some motions. . . . So don't give up any of your arguments for appellate, okay?

Addressing Meyer again at the end of the hearing, the trial court stated:

> All right. I'm giving you an opportunity to give me any facts you want to give me that you didn't give me last time. That's what I'm giving you ten days for. Okay? . . . I'm not going to consider any new issues. I'll be happy to receive any facts that you want to present to me on those issues.

The trial court explained that despite the rule cited in the motion, it understood the motion to be one for reconsideration of the issues, and it would address the motion as such. The grounds, with the exception of the second ground that Appellants dropped, were issues brought up in the initial hearing.

Acknowledging the flexibility of the particularity requirement, we find the court fairly addressed the motion as a Rule 59(e) motion for reconsideration. Any potential prejudice to Meyer was relieved by permitting ten days after the hearing to file any other arguments she felt applicable. For the foregoing reasons, we hold the filing of the captioned Rule 59(a) motion for reconsideration tolled the time period to file a notice of appeal, and therefore, Appellants' notice of appeal was timely.

## II. Interstate Commerce within the definition of the FAA

■ Appellants argue the trial court erred in finding the employment contract with Meyer did not involve interstate commerce. Specifically, they contend interstate commerce is broadly construed for purposes of the FAA; thus, because the employment contract's named cases required out-of-state travel and work from Meyer, the contract involved interstate commerce. We agree.

■■ "Unless the parties have otherwise contracted, the FAA applies in federal or state court to any arbitration agreement regarding a transaction that involves interstate commerce." *MBNA America Bank, N.A. v. Christianson*, 377 S.C. 210, 213, 659 S.E.2d 209, 211 (Ct.App.2008) (citing *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 538, 542 S.E.2d 360, 363 (2001)). The FAA provides: "A written provision in any [ ] contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (2009). "The words 'involving commerce' have been interpreted by the United States Supreme Court as being the functional equivalent of 'affecting commerce'-words signaling 'an intent to exercise Congress' commerce power to the full.'" *Thornton v. Trident*

*Med. Ctr., L.L.C.,* 357 S.C. 91, 95, 592 S.E.2d 50, 52 (Ct.App. 2003) (quoting *Allied–Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 277, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995)); *see also Citizens Bank v. Alafabco, Inc.,* 539 U.S. 52, 56, 123 S.Ct. 2037, 156 L.Ed.2d 46 (2003) ("We have interpreted the term 'involving commerce' in the FAA as the functional equivalent of the more familiar term 'affecting commerce'-words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power."). " 'Because the statute provides for the enforcement of arbitration agreements within the full reach of the Commerce Clause, it is perfectly clear that the FAA encompasses a wider range of transactions than those actually in commerce-that is, within the flow of inter-state commerce.' " *Thornton,* 357 S.C. at 95, 592 S.E.2d at 52 (quoting *Citizens Bank,* 539 U.S. at 56, 123 S.Ct. 2037).

■ "In all cases, determination of whether a transaction involves interstate commerce depends on the facts of the case." *Id.* (citing *Zabinski v. Bright Acres Assocs.,* 346 S.C. 580, 594, 553 S.E.2d 110, 117 (2001) ("To ascertain whether a transaction involves commerce within the meaning of the FAA, the court must examine the agreement, the complaint, and the surrounding facts.")). "Our courts consistently look to the essential character of the contract when applying the FAA." *Id.* at 96, 592 S.E.2d at 52 (finding it was proper to "focus upon what the terms of the contract specifically require for performance in determining whether interstate commerce [was] involved").

Our supreme court and this court have ruled on several cases which are applicable to our determination of whether the contract at bar involves interstate commerce. *See Munoz v. Green Tree Fin. Corp.,* 343 S.C. 531, 542 S.E.2d 360 (2001) (finding interstate commerce involved in a construction con-tract where a builder was domiciled in South Carolina, but under the contract, was assigned rights to a Delaware credi-tor); *Soil Remediation Co. v. Nu–Way Envtl., Inc.,* 323 S.C. 454, 476 S.E.2d 149 (1996) (holding interstate commerce was involved in a contract requiring removal of water and sludge from property in South Carolina to a facility in North Car-olina); *Timms v. Greene,* 310 S.C. 469, 427 S.E.2d 642 (1993) (stating that a contract between a nursing home and patient did not involve interstate commerce, despite the fact that the

nursing home was a division of a Delaware partnership, marketed its services to persons residing outside of the state, and purchased the majority of its supplies and equipment from out-of-state; the Court reasoned that the performance of the contract, the provision of patient-resident services in South Carolina, did not require any activities in interstate commerce); *Episcopal Hous. Corp. v. Federal Ins. Co.*, 269 S.C. 631, 640, 239 S.E.2d 647, 652 (1977) (concluding performance required under a contract for the construction of an eighteen-story building involved interstate commerce because "[i]t would be virtually impossible to construct" such a building "with materials, equipment and supplies all produced and manufactured solely within the State of South Carolina."); *Blanton v. Stathos*, 351 S.C. 534, 541, 570 S.E.2d 565, 569 (Ct.App.2002) (determining that a contract for design and architectural services in the construction of a restaurant in South Carolina involved interstate commerce because "the contract not only contemplated the use of materials manufactured outside the state of South Carolina, but realistically the project could not be constructed without the use of materials in interstate commerce").

In *Thornton v. Trident Med. Ctr., L.L.C.*, James Thornton entered into a recruiting agreement with Trident Medical Center. 357 S.C. 91, 93, 592 S.E.2d 50, 51 (Ct.App.2003). The agreement required Thornton to relocate his medical practice from Michigan to Charleston, SC, for a total of at least four years and included the additional terms: (1) a net collectable revenue guarantee which provided Thornton with a guaranteed income for twenty-four months; (2) a signing bonus; (3) a relocation agreement for payment of moving expenses; and (4) an agreement providing that Thornton was being recruited into the existing practice of SCCA. *Id.* An arbitration clause was included in the contract. *Id.* Thornton left Charleston before the contracted four years and filed a declaratory judgment seeking a determination that the arbitration clause was unenforceable. *Id.* at 94, 592 S.E.2d at 51. In finding the contract involved interstate commerce such that the FAA applied, this court decided the "subject matter of the contract clearly [extended] beyond Thornton's obligation to provide medical services in South Carolina." *Id.* at 97, 592 S.E.2d at 53. This court found the recruiting agreement was primarily

to induce Thornton to move from Michigan to South Carolina. *Id.* at 97–98, 592 S.E.2d at 53. Additionally, the agreement included reimbursement for Thornton's relocation expenses and prevented Thornton from practicing in any other state other than South Carolina for four years. *Id.* Thus, "the contract was denominated as and was intended as a recruiting agreement to induce Thornton's move across state lines," and "[t]he express purpose [ ] was to provide a monetary incentive, consisting of multiple related promises, to induce Thornton to relocate his professional medical services practice from Michigan to South Carolina." *Id.* at 98, 592 S.E.2d at 53.

In contrast, our supreme court found the agreement in *Timms v. Greene* did not involve interstate commerce. 310 S.C. 469, 473, 427 S.E.2d 642, 644 (1993). The *Timms* contract was between a nursing home and one of the nursing home's residents and included an arbitration clause. *Id.* at 470–71, 427 S.E.2d at 643. In support of its decision, the supreme court found the only evidence raised to show interstate commerce was that the nursing home: (1) was a division of National HealthCorp, L.P., a Delaware Limited Partnership; (2) marketed its services to persons residing outside this State; (3) hired employees from outside the State; (4) purchased a majority of its goods, equipment and supplies outside the state for use at the home; and (5) contemplated payment in part by Medicare or Medicaid. *Id.* at 473, 427 S.E.2d at 644. The court stated although the listed factors could show the nursing home's involvement in interstate commerce, their relationship to the agreement between the nursing home and the resident was "insufficient to form the basis of the contract between the parties." *Id.*

*Towles v. United Healthcare Corp.* is also relevant to our analysis here. 338 S.C. 29, 524 S.E.2d 839 (Ct.App.1999). United Healthcare Corporation (United) was a national company headquartered in Minnesota. *Id.* at 33, 524 S.E.2d at 841. United hired Winfield Towles as a medical director in South Carolina and required him to sign a Code of Conduct and Employment Handbook, which included an arbitration clause. *Id.* at 33–34, 524 S.E.2d at 841–42. This court noted Towles' responsibilities included helping to establish medical policy, overseeing utilization review and quality management for plan participants, attending out-of-state conferences, par-

ticipating in telephone conferences with United's corporate medical affairs staff in Minnesota, and reviewing claims from out-of-state providers and specialty providers located in North Carolina and Georgia. *Id.* at 36, 524 S.E.2d at 843. Furthermore, Towles participated in sales presentations in South Carolina and Georgia and worked with officials from national companies in resolving questions of utilization review and medical necessity for PHP participants. *Id.* Towles also reviewed proposals for services from out-of-state medical and ancillary service providers. *Id.* This court found those activities provided "sufficient evidence of interstate commerce to invoke the FAA." *Id.*

In this case, the trial court found the facts to be most similar to *Timms* because "an attorney is providing legal services for a South Carolina law firm doing business in South Carolina." The trial court then stated even if the facts are as the Appellants state them to be, they fail to rise to the level of involving or affecting interstate commerce because domicile of the parties to the litigation, activities outside the state of South Carolina incident to the completion of a transaction, and receipt of insurance proceeds do not render a transaction as "involving" or "affecting" interstate commerce within the purview of the FAA. In the hearing for the motion to reconsider, the trial court stated:

> My concern was that we were simply looking at an employment contract between two attorneys here in Charleston, South Carolina, and I did not feel like you could expand it by saying that she's working on cases that were involving [out-of-state] information or interstate commerce. That's the reason basically I ruled the way I ruled.

Despite the trial court's reasoning, this court finds *Towles* most applicable to these facts.[1] Using the *Towles* court's

---

1. *Equal Emp't Opportunity Comm. v. Rinella & Rinella* is also persuasive in our analysis, although not controlling. 401 F.Supp. 175 (N.D.Ill.1975). *Rinella* was a Title VII action; however, its discussion regarding how a local law firm dealing primarily in divorces affects interstate commerce is instructive. *Id.* at 181–82 ("Notwithstanding the defendants' divorce orientation, they admit that their practice encompasses other types of business, i.e., corporate, probate and real estate. They further admit that various attorneys travel out of state on firm business. Samuel Rinella, for instance, travelled to London, England and to Arizona, and Richard Rinella travelled to Washington,

analysis, this court holds the employment contract involves interstate commerce. Even though Firm is not a national employer as United was, Firm handles business with many out-of-state clients, similar to United. However, our holding does not deem all employment contracts involving attorneys' services subject to the FAA. It is critical that this is not a situation where Meyer simply worked in South Carolina on cases that involved out-of-state clients and businesses. Here, Meyer was employed to work on specific cases, which were identified in the contract, that Appellants allege involved interstate commerce. Despite the fact there is not substantial documentation regarding out-of-state traveling or work Meyer may have done in the cases in the initial contract, the subsequent amendment to the contract was designed with the express purpose of allowing additional compensation and provisions for the Ocean Club case, a case which involved significant out-of-state work. The 2007 Amendment references a $10,000 advance on her Ocean Club work, with the expectation of further compensation to come in the near future as partial settlements occurred. Meyer travelled extensively to conduct her legal work and billed hours for her out-of-state work and travel. Pre-bill worksheets for the Ocean Club case reflect travels to Atlanta, Georgia; Sarasota Beach, Florida; Charlotte, North Carolina; Minneapolis, Minnesota; and Knoxville and Kingsport, Tennessee. Moreover, Meyer brought this claim to recover $1.7 million for the value of her labor on the Ocean Club case, implicating the substantial amount of work and time she spent on this particular case. Considering the liberal application of the Commerce Clause, and recognizing the FAA is to be construed to full extent of the Commerce Clause, we find Meyer's out-of-state activities rose to the level of "involving interstate commerce," and thus, triggered the enforcement of the FAA. *Compare Flexon v. PHC–Jasper, Inc.*, 399 S.C. 83, 88–90, 731 S.E.2d 1, 4 (Ct.App.2012) (affirm-

---

D.C. The firm's long distance phone bill in calendar year 1974 was $1,277.01; its out-of-state travel expenses amounted to approximately $2,000 for the same year. The firm also purchased both office intercommunication equipment from an out-of-state company for $8,400, and law and reference books from out-of-state publishers billed at approximately $2,500. These various factors establish that Rinella & Rinella indeed affects interstate commerce and, accordingly, is subject to the proscriptions of Title VII.").

ing the trial court's finding that the agreement did not involve interstate commerce because it was a contract calling for "local services to be performed by a Hardeeville resident at a medical facility located in Hardeeville," and thus, did not implicate the FAA). For the foregoing reasons, we reverse the trial court and find the FAA does apply to the parties' employment contract.

## III. Unconscionability

Arbitration is a matter of contract law and is available only when the parties involved contractually agreed to arbitrate. *Towles*, 338 S.C. at 37, 524 S.E.2d at 843–44. "Accordingly, a party may seek revocation of the contract under 'such grounds as exist at law or in equity,' including fraud, duress, and unconscionability." *Simpson v. MSA of Myrtle Beach, Inc.*, 373 S.C. 14, 24, 644 S.E.2d 663, 668 (2007) (quoting S.C.Code Ann. § 15–48–10(a) (2005)). Arbitration will be denied if a court determines no agreement to arbitrate existed. S.C.Code Ann. § 15–48–20(a) (2005).

"General contract principles of state law apply in a court's evaluation of the enforceability of an arbitration clause." *Simpson*, 373 S.C. at 24, 644 S.E.2d at 668 (citing *Munoz v. Green Tree Fin. Corp.*, 343 S.C. 531, 539, 542 S.E.2d 360, 364 (2001)). "In South Carolina, unconscionability is defined as the absence of meaningful choice on the part of one party due to one-sided contract provisions, together with terms that are so oppressive that no reasonable person would make them and no fair and honest person would accept them." *Id.* at 24–25, 644 S.E.2d at 668 (citing *Carolina Care Plan, Inc. v. United HealthCare Servs., Inc.*, 361 S.C. 544, 554, 606 S.E.2d 752, 757 (2004)). If a court as a matter of law finds any clause of a contract to have been unconscionable at the time it was made, the court may refuse to enforce the unconscionable clause, or so limit its application so as to avoid any unconscionable result. S.C.Code Ann. § 36–2–302(1) (2003).

"In analyzing claims of unconscionability in the context of arbitration agreements, the Fourth Circuit has instructed courts to focus generally on whether the arbitration clause is geared towards achieving an unbiased decision by a neutral decision-maker." *Simpson*, 373 S.C. at 25, 644 S.E.2d at 668;

*see Hooters of Am., Inc. v. Phillips,* 173 F.3d 933, 938 (4th Cir.1999). Our supreme court has adopted the Fourth Circuit's view, and "[i]t is under this general rubric that [this court determines] whether a contract provision is unconscionable due to both an absence of meaningful choice ***and*** oppressive, one-sided terms." *Simpson,* 373 S.C. at 25, 644 S.E.2d at 669 (emphasis added).

## 1. Absence of meaningful choice

Appellants argue the trial court erred in finding there was an absence of meaningful choice because Meyer had been working for Firm for six months before receiving the 2006 employment agreement and she essentially had to agree to it or else "jeopardize her existing job." We agree.

"Absence of meaningful choice on the part of one party generally speaks to the fundamental fairness of the bargaining process in the contract at issue." *Id.* at 25, 644 S.E.2d at 669; *see Carlson v. General Motors Corp.,* 883 F.2d 287, 295–96 (4th Cir.1989). "In determining whether a contract was 'tainted by an absence of meaningful choice,' courts should take into account the nature of the injuries suffered by the plaintiff; whether the plaintiff is a substantial business concern; the relative disparity in the parties' bargaining power; the parties' relative sophistication; whether there is an element of surprise in the inclusion of the challenged clause; and the conspicuousness of the clause." *Simpson,* 373 S.C. at 25, 644 S.E.2d at 669 (quoting *Carlson,* 883 F.2d at 293, 295); *see also Holler v. Holler,* 364 S.C. 256, 269, 612 S.E.2d 469, 476 (Ct.App.2005) ("A determination whether a contract is unconscionable depends upon all the facts and circumstances of a particular case.").

"[U]nder general principles of state contract law, an adhesion contract is a standard form contract offered on a 'take-it-or-leave-it' basis with terms that are not negotiable." *Simpson,* 373 S.C. at 26–27, 644 S.E.2d at 669 (citing *Munoz v. Green Tree Fin. Corp.,* 343 S.C. 531, 541, 542 S.E.2d 360, 365 (2001)). The finding of an adhesion contract is not per se unconscionable, however it is the beginning point to the analysis. *Id.* at 27, 644 S.E.2d at 669.

We hold Meyer had a meaningful choice involving the 2006 agreement. Meyer argues her lack of civil experience put her at a disadvantage as it relates to the relative sophistication of the parties. However, we find her substantial work as an assistant solicitor in addition to her time at law school permitted Meyer to have enough sophistication that any disadvantage would be minimal in this situation. In concluding the 2006 agreement, Firm stated:

> Please acknowledge receipt of this communication when you receive it. After spending some time reviewing it, if you are in agreement with this, please so indicate by counter-signing below and returning to me at your convenience. If you need a meeting to discuss, just let me know.

The 2006 agreement, as shown above, allowed Meyer as much time as she needed to understand and accept the conditions. In addition, the 2006 agreement stated a meeting could be set up if there was a need to discuss the terms, allowing for negotiation of the terms. Because of this apparent opportunity for negotiation, this was not an adhesion contract. It did not force Meyer to "take-it-or-leave-it." Rather, it indicated Meyer had some bargaining power, while perhaps not as much as the Firm. We also note Meyer felt comfortable striking out language to which she objected in the 2007 amendment; again, supporting her ability to negotiate these contracts. Further, this was not a lengthy contract at three pages. The arbitration clause is on the second page, and it is not "buried" within the short contract; thus, there does not appear to be any element of surprise.

While Meyer argues that because the employment climate for law firms was difficult, she felt she was forced to agree to the contract, we do not find that is a valid reason for holding there was an absence of meaningful choice. It is unfortunate the employment or economic climate may have been difficult at that particular time, but the external environment did not extinguish Meyer's meaningful choice of whether to sign the contract or not. Further, we recognize Lucey and the Firm did not contribute to the negative economic climate; therefore, we cannot use that as a factor against them in this case. For the foregoing reasons, we hold the trial court erred in finding there was an absence of meaningful choice.

## 2. Oppressive and one-sided terms

■ Appellants argue the terms of the arbitration clause are not unduly harsh because its sole limitation is the present-ment of live witnesses and there is no other limitation of evidence or testimony. We agree.

As stated previously, this prong of the test sets forth that we are to review the terms to see if no reasonable person would make them and no fair and honest person would accept them. *Simpson*, 373 S.C. at 24–25, 644 S.E.2d at 668.

■■ "Arbitration laws are passed in order to expedite the settlement of disputes and should not be used as a means of furthering and extending delays." *Evans v. Accent Manufactured Homes, Inc.*, 352 S.C. 544, 550, 575 S.E.2d 74, 76 (Ct.App.2003). The benefits received by arbitrating come with certain limitations on discovery. *See Rhodes v. Benson Chrysler–Plymouth, Inc.*, 374 S.C. 122, 127, 647 S.E.2d 249, 251–52 (Ct.App.2007) (stating that if parties conducted little or no discovery, then the party seeking arbitration has not taken "advantage of the judicial system," thus, prejudice will likely not exist, and the law would favor arbitration; however, if the parties conducted significant discovery, then the party seeking arbitration took "advantage of the judicial system," prejudice will likely exist, and the law would disfavor arbitration); *In re Cotton Yarn Antitrust Litig.*, 505 F.3d 274, 286 (4th Cir.2007) (stating "while discovery generally is more limited in arbitration than in litigation, that fact is simply one aspect of the trade-off between the 'procedures and opportunity for review of the courtroom [and] the simplicity, informality, and expedition of arbitration' that is inherent in every agreement to arbitrate" and "[b]ecause limited discovery is a consequence of perhaps every agreement to arbitrate, it cannot, standing alone, be a reason to invalidate an arbitration agreement").

The arbitration clause in the 2006 agreement provides:

Any disputes arising in any way related to the matters set forth herein will be submitted to confidential, binding arbitration under expedited and abbreviated procedures, with the parties being the only witnesses called in person. If we are unable to agree on an arbitrator, I will choose one, you will choose one, and the two will choose a third.

While the arbitration clause here does limit discovery by allowing the parties to be the only witnesses called in person, this cannot, standing alone, be a reason to invalidate an arbitration agreement. Appellants are correct in stating that the arbitration restriction applies equally to both parties, and the clause places no apparent restrictions on the introduction of depositions of witnesses into arbitration proceedings. We find the arbitration clause is not one-sided, nor is it oppressive to Meyer. Because a finding of unconscionability requires an absence of meaningful choice as well as oppressive, one-sided terms, we reverse the trial court.

## IV.   Severability

Appellants contend that even if the provision limiting live witnesses is substantively unconscionable, the trial court should have severed that portion of the arbitration clause and compelled arbitration. Because we find the arbitration clause is not unconscionable, we need not review this argument. *See Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (ruling an appellate court need not review remaining issues when its determination of a prior issue is dispositive of the appeal).

## V.   Applicability of the SCUAA

Appellants contend that because the FAA applies to the employment contract at issue, it preempts the SCUAA and there is no need to meet the requirements of the state statutes. In addition to the FAA's preemption of the SCUAA, the SCUAA itself provides that it does not apply to arbitration agreements between employers and employees unless the agreement states that the SCUAA shall apply.

Because all parties agree the arbitration clause did not meet the SCUAA notice requirements,[2] and the trial court ruled it did not meet SCUAA requirements, there is no controversy for this court to rule upon. *Curtis v. State*, 345 S.C. 557, 567, 549 S.E.2d 591, 596 (2001) (stating "[a]n appellate court will

---

**2.** Appellants acknowledge the arbitration clause did not meet SCUAA's notice requirements, but argued that was irrelevant because SCUAA was inapplicable altogether.

not pass on moot and academic questions or make an adjudication where there remains no actual controversy").

## CONCLUSION

Based on the foregoing reasons, the trial court's denial of Appellants' motion to compel is

**REVERSED.**

HUFF and PIEPER, JJ., concur.